No. 81-245

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

SAWYER-ADECOR INTERNATIONAL, INC.,

Plaintiff and Appellant,

-vs-

B. C. ANGLIN, et al.,

Defendants and Respondents.

Appeal from: District Court of the Fifth Judicial District,
In and for the County of Beaverhead, The Honor-
able Frank Blair, Judge presiding.

Counsel of Record:

For Appellant:

Burns, Dwyer & Chaffin, Dillon, Montana

For Respondents:

Frank M. Davis, Dillon, Montana
W. G. Gilbert, III, Dillon, Montana
Cleland, Hurtt, Witt & Weil, Pittsburg, PA

Submitted on Briefs: April 1, 1982

Decided: June 24, 1982

Filed: JUN 24 1982

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Appeal by Sawyer-Adecor International, Inc. (Sawyer) from a judgment dated March 31, 1981, rendered against Sawyer in the District Court, Fifth Judicial District, Beaverhead County. The District Court quieted title to three unpatented mining claims (the Grouse claims), and further granted defendant James V. Joyce specific performance of a contract between him and Sawyer, or in the alternative, gave Joyce a judgment against Sawyer for $144,000, with interest from March 20, 1976.

On consideration of the whole record, we affirm the District Court.

## Specific Performance

In and prior to May 1975, Sawyer was the record owner of 64 unpatented lode mining claims in the Lemhi Pass area in Beaverhead County. In that month, negotiations commenced between Arthur E. Granger, representing Joyce, and Fred Maxey, the president of Sawyer, culminating in a "Memorandum of Intent," dated July 24, 1975.

The first paragraph of the memorandum provided:

"1.  In consideration of JOYCE undertaking mining, geologic and geophysical work of the SAWYER properties in Lemhi Pass, Montana, to the extent of a minimum of $6,400.00 worth, which will be recorded as assessment work for the year ending August 30, 1975 by JOYCE at the Beaverhead County Courthouse in Montana. SAWYER grants an option period to JOYCE for six months --- August 1, 1975 to February 1, 1976. Further, if an additional $6,400.00 worth of work is performed by JOYCE, the option may be extended to August 1, 1976. JOYCE may recommend, but only SAWYER may decide if this additional work may be undertaken. At the end of either option period, JOYCE may exercise this option to pick up a mining lease agreement based on that agreement enclosed in a letter dated June 4, 1975 addressed by Fred Maxey to Arthur E. Granger."

-2-

Joyce performed the assessment work for the year ending August 30, 1975, through Arthur E. Granger, who conducted, supervised and paid for the work. Joyce paid Arthur E. Granger $6,500 for doing that work. Assessment affidavits for the period involved, to August 1, 1975, were filed, on a group basis, with the county clerk and recorder, by Granger. In other words, the assessment work as required by the memorandum of intent was performed by Joyce through Granger.

If one reads again the first paragraph of the memorandum of intent, as set forth above, one will find an internal conflict in the paragraph respecting the time in which Joyce could exercise the option. The first sentence gives Joyce an option from August 1, 1975 to February 1, 1976. However, the last sentence of the paragraph provides that "[a]t the end of either option period JOYCE may exercise this option. . ." The last sentence does not require Joyce to exercise the option within the period specified in the first sentence.

At any rate, the mining lease (its terms are unimportant here) was never executed between Joyce and Sawyer.

On February 4, 1976, Sawyer, through its president, wrote to Granger that the company was considering the sale of its mining claims in Beaverhead County and asked Granger to "start contacting possible interested parties, with a view to initiating negotiations with them." Sawyer offered Granger a compensation of 10 percent of the sale price over the first $25,000 if the sale was consummated. Sawyer addressed the same letter to Dudley Davis and Dick Barron on the same basis for the solicitation of negotiations.

Upon receipt of the February 4 letter from Sawyer, Granger found that Joyce was interested in purchasing the mining claims of Sawyer, and thereupon negotiated with

-3-

its president. On March 8, 1976, Sawyer and Joyce executed a "letter of intent" respecting a purchase. It provided for a purchase price of $100,000 with $25,000 downpayment upon the signing of the contract of purchase and sale, including $1,500 to be paid at the time of the signing of the letter of intent. The balance was to be payable over a period of 5 years. Particularly, the March 8, 1976 letter of intent contained the following paragraphs:

> "5. The conditions and terms of the proposed contract of Purchase and Sale mentioned here- inabove are subject to the final approval of the Board of Directors of SAWYER.

> "6. Sixty (60) days after notice is given to JOYCE of Board approval of these conditions and terms, JOYCE shall consummate the contract of Purchase and Sale, and shall pay SAWYER the cash down payment mentioned [the $25,000 mentioned above]. If after sixty (60) days have elapsed after such notice JOYCE has not consummated the contract of Purchase and Sale, then JOYCE shall forfeit unconditionally to SAWYER the sum of $1,500 referred to in section 3 above."

On March 20, 1976, Granger, on behalf of Joyce, gave Sawyer a check for $1,500 as required in the letter of intent.

The agreement for Purchase and Sale is dated April 9, 1976 and is executed by James B. Joyce. Sawyer never executed the purchase and sale agreement mentioned and provided for in the letter of intent dated March 8, 1976.

The president of Sawyer testified that Sawyer's board of directors considered Joyce's proposed contract at a meeting on March 31, 1976, and rejected the proposal because a higher offer had been received from another party. The president further testified that this information was communicated by him to Granger by telephone soon after the board meeting, at which time Granger requested that the earnest money check for $1,500, which Granger had delivered at the time of the execution of the memorandum of intent, be returned to him and that his signature be cut from the check.

-4-

Sawyer, through Maxey, did not immediately return the $1,500 check, but simply left it in a file uncashed. However, on July 26, 1977, some 15 months later, Sawyer, through its president, returned the check to Granger. In the meantime, Sawyer had made a deal to sell the 64 claims to Tenneco for a total consideration of $244,000.

Sawyer, as plaintiff, brought an action in the Beaverhead County District Court on October 2, 1978, seeking to quiet title to the 64 unpatented lode mining claims. On February 14, 1980, Joyce filed an amended answer, crosscomplaint and counterclaim seeking quiet title in himself to the Grouse claims (more hereafter) claiming (1) that he is entitled to a mining lease under the option agreement dated July 24, 1975; (2) to a deed for all 64 of the claims upon performance by him of the terms of the contract under the letter of intent dated March 8, 1976; and (3) that he was owed $6,600 [sic] for the assessment work he had done for Sawyer.

The District Court made findings of fact and conclusions of law and entered judgment as we have indicated in favor of Joyce. Sawyer contends, and it appears correct, that the District Court adopted verbatim the findings of fact and conclusions of law presented by Sawyer. The appeal by Sawyer followed from the judgment in the normal course.

The issues raised by Sawyer that relate to the specific performance judgment are these:

1. Whether the District Court committed reversible error in adopting verbatim the findings of fact and con- clusions of law requested by Joyce and in adopting verbatim the post-trial brief of Joyce as the opinion of the court?

2. Whether the evidence supports the findings of fact and conclusions of law adopted by the court and whether the District Court erred in finding that the expired "option" to

-5-

lease could be unilaterally revived and converted into a contract for purchase of 64 unpatented lode mining claims?

3. Whether the District Court could rely on estoppel to determine that a contract existed between Sawyer and Joyce?

4. Whether the District Court erred in awarding damages to Joyce for breach of contract in the absence of pleadings or proof?

Verbatim Adoption of Proposed Findings

The continuing practice of verbatim adoption of proposed findings by district courts in judge-trials remains a sore point in this state, especially to losing counsel who see therein a lack of due consideration by the district courts of their parties' contentions of fact and law. We expressed our disapproval of adopting verbatim the prevailing parties' proposed findings and conclusions in Tomaskie v. Tomaskie (1981), ___ Mont. ___, 625 P.2d 536, 38 St.Rep. 416, and in that case referred to Canon 19, Canons of Judicial Ethics, 144 Mont. at xxvi-xxvii. In In Re Marriage of Jensen (1981), ___ Mont. ___, 631 P.2d 700, 703-711, 38 St.Rep. 1109, where the District Court had adopted verbatim findings and conclusions, it was suggested by appellant that a lower standard should exist for the review by us of findings and conclusions drafted by counsel for the prevailing party than exists under the "clearly erroneous" standard of Rule 52(a), M.R.Civ.P. We declined to adopt that suggestion in Jensen. Again, in City of Billings v. Public Service Com'n. (1981), ___ Mont. ___, 631 P.2d 1295, 38 St.Rep. 1162, we met the same problem, repeated that we disapproved of the practice of adopting verbatim findings and conclusions submitted by the prevailing

-6-

party, but restated that the standard for review of the findings and conclusions remains the same, citing United States v. El Paso Gas Co. (1964), 376 U.S. 651, at 656, 84 S.Ct. 1044, at 1047, 12 L.Ed.2d 12, at 17.

We continue to disapprove, heartily and stoutly, the verbatim adoption of proposed findings and conclusions. We have expressed the reasons on several occasions. We are not compelled, however, when in appellate review we are confronted with a verbatim adoption, to find such an inherent fault therein that the prevailing party must be reversed. Although the "clearly erroneous" standard of Rule 52(a), still applies to verbatim findings, it is equally incumbent upon us to apply, in appellate review of equity cases and proceedings of an equitable nature, the rule that we review all questions of fact arising upon the evidence presented in the record, whether the evidence is alleged to be insufficient or not, and to determine the same, as well as questions of law.  Section 3-2-204(5), MCA.  There is in that statutory requirement for our appellate review a measure of protection for the losing party coming to us on appeal, at least in equity cases such as this.

Whether the Record Supports the Findings and Conclusions of the District Court

The critical facts found by the District Court in connection with the contract for purchase of the mining claims were:  During the period from August 30, 1975 to March 8, 1976, Joyce was at all times ready and able to enter into the lease agreement in accordance with the memorandum of intent dated July 29, 1975; during that period, the defendant Joyce performed the $6,500 annual representation (assessment) work; Sawyer started negotations with Joyce and

others for a sale of all the mining claims which changed the lease into a contract for purchase by Joyce for the sum of $100,000; pursuant to the contract Joyce offered and Sawyer accepted a check for $1,500 in accordance with the proposed agreement of sale; the letter of intent of March 8, 1976 was executed with the authority of Sawyer's board of directors; Sawyer unreasonably withheld its formal consent to the agreement of sale accepted by Joyce and led Joyce to believe that a formal contract had been entered into by keeping the tendered downpayment of $1,500 while at the same time Sawyer was conducting secret negotiations for the sale of the property to others; on July 26, 1977, Sawyer returned to Joyce the $1,500 downpayment on which date Joyce discovered the purported sale to Tenneco.

Sawyer contends that the District Court erred in characterizing the memorandum of intent of July 24, 1975 as a lease when in fact it was an option to lease; that the assessment work was consideration for the option; that the lease never became effective; that no completed purchase and sale contract was entered into; that no evidence exists in the record to support the finding that the "lease and option" merged in a contract.

We can disregard the purported mining lease between the parties, and whether it matured into a contract for purchase, because in reality no mining lease ever existed between the parties. Sawyer never executed a mining lease. It is true, however, that because of the ambiguous language of paragraph one of the memorandum of intent of July 24, 1975, Joyce, having performed the assessment work required, either had an option for a mining lease that expired on February 1, 1976, or he may have such an option even now to procure a mining

-8-

lease upon the unpatented lode mining claims. The real question confronting us in this case is whether the execution by Sawyer and Joyce of the memorandum of intent on March 8, 1976, the execution of the agreement to purchase by Joyce on April 9, 1976, and the delivery of the $1,500 check to Sawyer constituted a mutually binding contract between Sawyer and Joyce for the sale of the mining claims to Joyce.

When we review a cause on appeal under section 3-2-204(5), MCA, our review and determination follow the appellate rules set forth in Lumby v. Doetch (1979), ___ Mont. ____, 600 P.2d 200, 202, 36 St.Rep. 1684, 1687:

> "In resolving this issue, we are guided by a number of principles established by this Court. The credibility of witnesses and the weight to be given their testimony are matters for the District Court's determination in a nonjury case. Corscadden v. Kenney (1977), ___ Mont. ____, 572 P.2d 1234, 1237, 34 St.Rep. 1533, 1537. Thus, in examining the sufficiency of the evidence, we must view the same in a light most favorable to the prevailing party, and we will presume the findings and judgment by the District Court are correct. Hellickson v. Barrett Mobile Home Transport, Inc. (1973), 161 Mont. 455, 459, 507 P.2d 523, 525. We will not overturn the findings and conclusions of the District Court unless there is a decided preponderance of the evidence against them, and when the evidence furnishes reasonable grounds for different conclusions, the findings of the District Court will not be disturbed. Morgen and Oswood Const. Co. v. Big Sky of Mont. (1976), 171 Mont. 268, 275, 557 P.2d 1017, 1021. The burden of proof is on the appellant. Schuman v. Study Com'n. of Yellowstone Cty. (1978), ___ Mont. ___, 578 P.2d 291, 292, 35 St.Rep. 386, 388."

To determine that a contract existed in this case, for the sale by Sawyer to Joyce of unpatented lode mining claims, we must find that the parties consented to the same thing in the same sense from the record in the case. Section 28-2-303, MCA. The essential elements of consent of the parties to the contract are that the consent must be free, mutual, and communicated by each to the other. Section 28-2-301, MCA.

-9-

Indubitably, the parties exhibited some degree of mutual consent when they executed (Sawyer with the approval of its board of directors) the March 8, 1976 letter of intent. Without setting it forth in haec verba, the March 8, 1976 letter of intent provided that Sawyer would warrant title to the mining claims and would sell them to Joyce for $100,000; that upon signing a contract for the purchase and sale approved by Sawyer's board, Joyce would pay $25,000; that upon signing the March 8, 1976 letter of intent, Joyce would pay, and did tender $1,500 as earnest money to be held by Sawyer and to be part of the cash downpayment of $25,000; that the balance of $75,000 was to be paid over 5 years under a promissory note signed by Joyce, bearing interest at 10 percent per annum. Then followed the provisions which we have above set forth providing that the conditions of the proposed contract for purchase and sale were subject to the final approval of Sawyer's board of directors and that the balance of the first cash downpayment would be due from Joyce 60 days after the board of directors had approved.

On April 9, 1976, Joyce executed an agreement to purchase the unpatented lode mining claims. That agreement meets exactly each and all of the conditions contained in the letter of intent of March 8, 1976. However, the agreement executed by Joyce added a provision that, in the event title to the mining claims be deemed defective, Joyce was given the option to acquire only such mining claims as bore good title with a pro rata reduction of the purchase price. To that extent, therefore, the acceptance by Sawyer through the written agreement of April 9, 1976 of the conditions in the memorandum of intent of March 8, 1976, was in variance.

-10-

To constitute a contract, a proposal must be accepted in the very terms in which it was made. Schwartz v. Inspiration Gold Mining Co. (Mont. 1936), 15 F.Supp. 1030, 1037; J. Neils Lumber Co. v. Farmers' Lumber Co. (1930), 88 Mont. 392, 397, 293 P. 288, 290; Glenn v. S. Birch & Sons Const. Co. (1916), 52 Mont. 414, 420, 158 P. 834, 836. The question of the existence of a contract does not end at this point, however.

Section 28-2-504, MCA, provides that "[a]n acceptance must be absolute and unqualified or must include in itself an acceptance of that character which the proposer can separate from the rest and which will bind the person accepting." The only provision in the April 9, 1976 agreement of purchase that is different from the March 8, 1976 letter of intent is the pro rata reduction of the purchase price for any mining claims to which Sawyer had a defective title. In the March 8, 1976 letter of intent, Sawyer warranted "that it owns certain mining claims in Beaverhead County, Montana." Joyce's proposal to reduce the purchase price in case Sawyer's title failed seems to take into account Sawyer's warrant of title. It could be argued therefore, that Joyce's April 9, 1976 agreement was an absolute acceptance, and not qualified as a new proposal. If Sawyer's warrant of title was good as to all the mining claims, there would be no pro rata reduction of the purchase price.

We find that Joyce's written acceptance, by the executed written agreement of April 9, 1976, was an acceptance which included "in itself an acceptance of that character which the proposer [Sawyer] can separate from the rest and which will bind the person accepting." Section 28-2-504, MCA.

-11-

Sawyer did not turn down Joyce's written agreement to purchase because of the added provision relating to failed title. Rather on March 31, 1976, while its March 8, 1976 letter of intent was still in effect, Sawyer determined unilaterally that it would reject any offer from Joyce under the March 8, 1976 letter because it had now obtained a better offer in price. Whatever other provision Sawyer might have required in connection with its contractual power to have its board of directors approve any future written contract, under the letter of intent of March 8, 1976, Sawyer absolutely bound itself to contract with Joyce to sell the mining properties to him for $100,000.

The March 8, 1976 letter of intent constituted at least a continuing offer (if not a contract) from Sawyer to Joyce to sell him the unpatented lode mining claims for $100,000. Sawyer reneged on the purchase price by determining unilaterally on March 31, 1976 that it would not sell the property to Joyce for $100,000. Sawyer's board of directors never got around to considering Joyce's proposal, in his written agreement, for a prorata reduction of the purchase price for failed title.

If the March 8, 1976 letter of intent is to be construed as a continuing offer rather than a binding contract, it could be revoked by Sawyer at any time before its acceptance by Joyce, but not afterwards. Section 28-2-511, MCA. In order to revoke the offer of March 8, 1976, Sawyer must have communicated that revocation to Joyce before he accepted the continuing offer. Section 28-2-512, MCA. That revocation should have been communicated by some act on the part of Sawyer informing Joyce of the revocation of the offer. Section 28-2-501, MCA. Here Sawyer's president testified that

-12-

at some unspecified time he telephoned to Granger that Joyce's deal was off because Sawyer had gotten a better offer. No direct communication was had with Joyce on this subject by Sawyer. The evidence shows that Joyce never knew of the telephone conversation or of the revocation until after Sawyer returned the $1,500 check, some 15 months later, on July 26, 1977. Of course if Granger was Joyce's agent in the transaction, with the actual or ostensible authority in Granger to receive such a communication of revocation, then the telephone call to Granger would be sufficient. There is, however, nothing in the record to indicate that the telephone call to Granger occurred before the April 9, 1976 written agreement submitted by Joyce. Joyce's acceptance, by the executed agreement of April 9, 1976 therefore, preceded the communication to him of Sawyer's revocation of the offer, again assuming arguendo that the March 8, 1976 letter of intent was an offer.

This brings us to the third issue raised by Sawyer, whether the District Court properly considered estoppel in determining that a contract existed between Sawyer and Joyce for the sale and purchase of the mining claims.

The District Court stated in its opinion (a brief also submitted by Joyce, and adopted verbatim by the court) that "elementary principles of estoppel" bound Sawyer to its contract with Joyce.

The acts relied upon by the District Court to constitute estoppel against Sawyer were that Joyce had performed $6,500 of annual representation work at the behest of Sawyer; that while the option to enter into a mining lease was still open

-13-

Sawyer started negotiations with Joyce and with others for the purpose of making a sale of the mining claims; that Sawyer agreed to sell Joyce the mining claims for $100,000; that Joyce tendered Sawyer $1,500 as a downpayment, in the form of a check which was accepted by Sawyer; that the March 8, 1976 letter of intent was executed by Sawyer's corporate offices and duly authorized by its board of directors; that Sawyer unreasonably withheld its formal consent to the agreement of sale accepted by Joyce, while at the same time conducting negotiations for the sale of said property to others at a higher price; that Sawyer wrongfully sold the 61 claims to Tenneco for a sum of $244,000 when by its conduct it had already effected a sale to Joyce for $100,000; that Joyce did not discover the purported sale to Tenneco until the check was returned to him after July 26, 1977.

Sawyer contends that the District Court should not have considered estoppel against it (1) because Joyce did not affirmatively plead estoppel and (2) the evidence for estoppel against Sawyer is insufficient.

Estoppel is an affirmative defense which must be specially alleged in the pleadings. Rule 8(c), M.R.Civ.P. This Court has always held, however, that where there has been no opportunity to allege estoppel, it may be put in evidence with the same effect as if alleged. Scott v. Prescott (1924), 69 Mont. 540, 556, 223 P. 490, 495; Colwell v. Grandin Inv. Co. (1922), 64 Mont. 518, 527, 210 P. 765, 767. If the evidence of estoppel is admitted without objection, pleading is not necessary. Middle States Oil Corporation v. Tanner-Jones Drill. Co. (1925), 73 Mont. 180, 183, 235 P. 770, 771. Because of the nature of the pleadings in this case, Joyce was not given an opportunity to allege estoppel as an affirmative defense. Sawyer filed an ordinary quiet

-14-

title complaint, which required all defendants to appear and set forth their claims as to the property involved. Joyce appeared by way of general denial to Sawyer's complaint and set forth four counts in crossclaim including a claim that Joyce had exercised the right to purchase the property from Sawyer but Sawyer refused to honor his right. Sawyer filed a reply to the crossclaim by way of general denial. Under Rule 7, M.R.Civ.P., Joyce was permitted no other pleading. In the pleadings of the cause, Joyce's stance was much like that of a plaintiff, asserting his claims to the property as against Sawyer, but without a right of reply. He therefore had no opportunity to plead estoppel as an affirmative defense. Under our case law Joyce is entitled to give evidence in support of estoppel.

Do the facts relied upon in the District Court constitute estoppel? In State ex rel. Howeth v. D. A. Davidson & Co. (1973), 163 Mont. 355, 367, 517 P.2d 722, 728-29, we set forth elements to be considered in determining estoppel. We find in this case, Sawyer repudiating its March 8, 1976 letter of intent, executed by it with the authority of its board of directors without notifying Joyce directly or immediately; Joyce relying on the letter of intent of March 8, 1976; and Granger tendering a check to Sawyer for $1,500 in payment on Joyce's part for that letter of intent. Joyce, after the secret repudiation by Sawyer's board of directors, executed an agreement in accordance with the letter of intent which was apparently refused by Sawyer because it had a better offer. Because of these acts of Sawyer, Joyce stood to lose the benefit of his bargain.

-15-

We do not rely on estoppel in deciding this case. We find a situation where Sawyer had left open a continuing offer to sell the mining claims to Joyce under the March 8, 1976 letter of intent which Joyce accepted before Sawyer revoked it properly. Joyce is entitled to the bargain struck between him and Sawyer and to any increased benefit thereof that thereafter developed.

The final issue raised by Sawyer with respect to the judgment entered by the District Court is that it erred in awarding damages for breach of contract in the absence of pleadings or proof.

The District Court, as we have said, ordered specific performance by Sawyer of the contract with Joyce for the sale of the unpatented lode mining claims, or in the alternative, gave Joyce a judgment against Sawyer for $144,000, with interest from March 20, 1976.

In his amended answer and crossclaim to Sawyer's action for quiet title, Joyce prayed that the court order Sawyer to execute and deliver to him a deed for the mining properties upon the payment by Joyce of any sums found due and owing to Sawyer.

In finding and concluding that Joyce was entitled to specific performance, the court entered a judgment accordingly. However, the court further decreed if Sawyer did not or could not perform, then it should pay Joyce $144,000, with interest from March 20, 1976.

The sum of $144,000 is obviously the difference between what Joyce agreed to pay Sawyer for the property, $100,000, and the price Tenneco is apparently willing to pay or has paid Sawyer for the property, $244,000. The March 20, 1976 date comes from the date of the $1,500 check that was delivered

-16-

to Sawyer on behalf of Joyce as partial payment under the letter of intent of March 8, 1976.

The court's award of $144,000 to Joyce is not damages in the true sense, because Sawyer can avoid that damage figure by conveying to Joyce the mining claims, subject to the payments required by Joyce under the contract between them. In so providing in its order, the District Court, sitting as a court of equity, has merely fashioned a way to make effective its decree of specific performance. The District Court has acted in the interests of judicial economy in case of nonperformance by Sawyer under the decree.

When a District Court sits as a court of equity, it is empowered to determine the questions involved in the case and to do complete justice. Hames v. City of Polson (1949), 123 Mont. 469, 477, 215 P.2d 949, 955; Link v. State by & through Dept. of Fish & Game (1979), 180 Mont. 469, 482, 591 P.2d 214, 222. Sawyer's fourth contention against the specific performance decree therefore is without merit.

The Grouse Claims

The problem with the Grouse claims is another phase of the case before the District Court on which the ruling was in favor of Joyce, and from which Sawyer appeals.

A part of the 64 contiguous unpatented mining claims to which Sawyer sought quiet title were those four claims described as Ragand 8, 9, 10 and 11.

In July 1965, Bill Anglin, the owner of a group of mining claims adjoining the Sawyer claims group, but across the Idaho border, checked at the office of the clerk and recorder in the Beaverhead County courthouse and discovered that no affidavit of performance of annual assessment work had been filed for the Sawyer claims group for the assessment

-17-

year ending September 1, 1974. Anglin entered the land covered by the Ragand 8-11 claims and on July 16, 1975, "overstaked" much of the ground covered by the Ragand claims with the Grouse I, II and III claims (hereafter Grouse claims). Anglin filed certificates of location for the Grouse claims in the office of the county clerk and recorder and each year thereafter filed affidavits of annual representation in that office to show that his assessment work for the Grouse claims was being performed.

Sawyer was apparently unaware of the staking, location, and filings relating to the Grouse claims, and its president testified that the assessment work was done on all of the 64 Sawyer group claims each year, but that it had omitted to file annual affidavits of representation in the office of the county clerk and recorder.

In August 1978, Joyce purchased the Grouse claims from Anglin. In his amended answer and crossclaim to Sawyer's quiet title complaint, Joyce claimed title to the Grouse claims by virtue of the transfer from Anglin, and his assessment work and filing of the necessary affidavits of representation thereafter.

Sawyer's evidence at trial was that although the annual affidavits of representation had not been filed by Sawyer, it nevertheless had done the assessment work on the claims by expending the required amounts of assessment work on a group basis. Joyce produced two witnesses who stated they had viewed the properties in question in several of the years involved, and saw no evidence of assessment work having been done on the mining claims. It is not clear from the record that the two witnesses visited all of the 64 claims in question.

The District Court determined and found that Sawyer had failed to do its annual assessment work on the claims for 1963 and 1964 and had not filed the required annual affidavits of representation. During trial, Sawyer took the position that under the law, even if it had failed to file the annual affidavits of representation, it could nevertheless maintain its title to the mining claims if in fact the annual assessment work was done by him. The District Court found as a fact that the annual assessment work had not been done on any of the claims and that the Ragand claims were open for location and filing as Grouse claims by Anglin.

Sawyer's issues with respect to the Grouse claims are:

1. The finding that the annual assessment work was not performed for the work year ending September 1, 1964 is clearly erroneous;

2. The District Court erred in determining the legal effect of Sawyer's failure to file an affidavit of annual representation;

3. Work resumed on the Sawyer claims group in 1965, prior to the time that Anglin located the conflicting Grouse claims;

4. The District Court erred in concluding that the Ragand claims had been abandoned by Sawyer;

5. Any doubt as to the validity of the overlapping Grouse claims should be resolved in favor of Sawyer because of the "bad faith" of Anglin.

Almost the whole of the District Court's determination that Joyce was the valid owner of the Grouse claims rests on the District Court's finding that Sawyer had failed to do its annual assessment work for the years involved. On the

-19-

one hand the District Court had the testimony of the officials of Sawyer that the assessment work had in fact been done, that it had arranged with a contractor or workman to do trenching in 1964 and 1965, and had otherwise done or caused to be done the assessment work in each annual segment required. On the other hand, the District Court had the testimony of Anglin that no work had been done in the year 1964, or in 1965; the testimony of two witnesses who saw no work being done on the mining claims by Sawyer; no substantiating testimony of workmen or contractors was produced by Sawyer to uphold the testimony of Sawyer's officers; and the inescapable fact that Sawyer had not filed any annual affidavits of representation. The great weight of the testimony favors the District Court's determination. There is no need to cite a long string of cases, all available in our annals, that on appellate review, the finding of a District Court will be sustained where it is not clearly erroneous, and where substantial credible evidence supports the findings of the District Court.

That finding alone, that Sawyer had failed to do any assessment work on the claims for the period here involved, without more, is sufficient to overcome all of Sawyer's fact issues. The court's finding precludes any argument that Sawyer had resumed its assessment work in 1975 before Anglin made his Grouse locations, sustains the District Court's determination that the Ragand claims had been abandoned by Sawyer and makes irrelevant Sawyer's claim that the failure to file affidavits of annual representation has no legal adverse effect on Sawyer, if it actually did the assessment work.

However, the basis of Sawyer's claim, that failure to file the annual representation affidavits did not adversely affect Sawyer's title, should be explained.

Former section 50-704, R.C.M. 1947, provided that the owner of a lode or placer mining claim who performed the annual assessment work could file in the office of the county clerk and recorder where the claim was situated an affidavit showing the nature and character of the work that had been done on the mining claim. Section 50-704 further provided that "such affidavits . . . are prima-facie evidence of the facts therein stated."

Thus, under former section 50-704, R.C.M. 1947, this Court had decided that an affidavit of annual representation is prima facie evidence that assessment work has been done, but that oral evidence could be given to prove that the work had been done without regard to the affidavit. Davidson v. Bordeaux (1895), 15 Mont. 245, 250, 38 P. 1075, 1076. We held that the statute was merely a means of preserving prima facie evidence that the assessment work requirement had been fulfilled. Coleman v. Curtis (1892), 12 Mont. 301, 305, 30 P. 266, 267.

Section 50-704, R.C.M. 1947, was amended by the legislature in 1971, and is now carried forward as section 82-2-103, MCA. The effect of the 1971 amendment is that whereas under section 50-704, the filing of an annual affidavit was permissive ("may") it is now under section 82-2-103, MCA, mandatory ("must"). In addition, the clause we have cited above has been changed to recite that "[T]he failure to file such affidavits within the period allowed therefor shall be prima facie evidence that such labor has not been performed and that the owner of the claim or claims has abandoned and surrendered same."

-21-

Sawyer claims that the District Court applied the mandatory provision of section 82-2-103, MCA, to this claim when in fact the assessment work involved was performed at a time when the statute was permissive, in 1964 and 1965. Sawyer therefore claims that the court applied the wrong legal test with respect to the effect of failure to file annual affidavits of representation.

As we have indicated, the issue is one that we need not reach. The District Court determined that no assessment work had been done by Sawyer. Under that finding, it makes no difference whether we apply the provisions of the statute on recording of annual affidavits before or after its amendment in 1971. Since no annual assessment work was done by Sawyer, the statute does not come into play and is irrelevant.

Sawyer's final contention is that Anglin, in making the Grouse location, was guilty of bad faith and for that reason the prior rights of Sawyer should be recognized.

The gist of Sawyer's claim on this contention is that work had taken place on the Sawyer claims prior to July 15, 1965 and each year thereafter. One of Joyce's witnesses, Granger, admitted seeing machines including a bulldozer on the properties during either 1965 or 1966, and acknowledged that work had been done on the "shear zone", a part of the claims. Sawyer's contention is that under mining law, even though claims may be subject to forfeiture by failure to perform assessment work, the original locator can subsequently re-enter the claims, and as long as he is actively performing work he will defeat the rights of any subsequent junior locator. Sawyer further contends that Anglin observed the activities of Sawyer for a period of three years until he discovered that an affidavit and assessment work had not

been filed, and then he quickly moved in and "jumped" the Ragand claims.

It is true that in Columbia Standard Corp. v. Ranchers Explor. & Dev., Inc. (10th Cir. 1972), 468 F.2d 547, it was held that a junior locator who had entered and overstaked prior claims without making inquiry of knowledgeable persons or examining the senior locator's claims individually to see if location requirements had been satisfied could not maintain the junior mining claims because of his bad faith. We do not have such a case here. Again the determination of the District Court that the assessment work had not been done is conclusive against this contention.

Other Issues

With respect to the whole case, Sawyer also raises additional issues contending that the court should have applied the doctrines of estoppel and laches against Joyce, particularly relating to his claim of contract for the purchase of the 64 unpatented mining lode claims. Those issues, however, do not reach the principle issues in this case and are inconsequential. The court's decision in favor of Joyce appears to us to be soundly based. We see no basis for estoppel against Joyce, nor any ground to determine he was guilty of laches.

Accordingly, the judgment of the District Court is affirmed.

John C. Shuchy
Justice

-23-

We Concur:

_____
Chief Justice

_____

_____

_____
Justices