# FILED

March 4 2009

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 07-0648

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 62

STATE OF MONTANA,

      Plaintiff and Appellee,

v.

DANIEL LACEY,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 2005-259
Honorable G. Todd Baugh, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Robin A. Meguire, meguirelaw.com, Great Falls, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General, C. Mark Fowler,
Assistant Attorney General, Helena, Montana

          Dennis Paxinos, Yellowstone County Attorney, Ann-Marie McKittrick,
Deputy County Attorney, Billings, Montana

Submitted on Briefs:  January 7, 2009

Decided:  March 3, 2009

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    Daniel Gerard Lacey (Lacey) appeals the denial of his motion to suppress and conviction on four counts of felony sexual intercourse without consent and two counts of felony sexual assault in the Thirteenth Judicial District Court.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2    In February 2005, Lacey and his then-girlfriend Carla Dozier (Dozier) moved into a house on Rimrock Road in Billings, Montana.  Dozier had three children from previous relationships who lived with her and Lacey.  Only Dozier's name appeared on the lease agreement for the house.  Lacey owned a laptop computer which was routinely kept in a makeshift office in the house.  This office was also used to store children's books, movies, and various other items.  The office was accessible to all members of the house.  Although the children were not allowed to use the laptop, Dozier would occasionally access the laptop in order to send email, watch videos, and store personal photographs.  On some occasions, the laptop was located on a desk in the office.  At other times, Lacey would store the laptop in a closed case, or take the laptop with him while he was away on business.

¶3    On March 14, 2005, the laptop was on a desk in the office, plugged in and ready for use.  Lacey was not in the house.  Dozier accessed the laptop to search for evidence that Lacey was being unfaithful to her.  During an extended file search of the computer, Dozier located sexually explicit images involving children.  Among the images were pictures showing Lacey sexually abusing her six year-old daughter.  Dozier testified that she was shocked and horrified to see these images.  In reaction, she quickly deleted one

2

of the images. After doing so, Dozier realized that she was deleting evidence that something had happened to her daughter, so she called Lacey to help her retrieve the image. Dozier did not tell Lacey what was contained in the image, telling him instead that the deleted image depicted the two of them together. With Lacey's verbal assistance, she was able to retrieve the deleted image. During this phone conversation, Lacey never instructed Dozier to stop using the laptop.

¶4 After the initial conversation, Dozier and Lacey spoke by phone again throughout the day. During one of these conversations, Dozier told Lacey about the exact nature of the images she found on the laptop. Sometime thereafter, Lacey came to the house, and Dozier confronted him again about the images and physically assaulted him. Lacey left the house in his car. After Lacey left the house, Dozier reported the evidence she discovered to the Billings Police Department. Officer Wanda Spaulding (Officer Spaulding) of the Billings Police Department responded to the dispatch at approximately 5:30 p.m. When she arrived at the house, Dozier told Officer Spaulding that she had discovered several images of Lacey sexually abusing her minor daughter. Dozier led Officer Spaulding to the laptop computer which was still located in the office. The laptop was sitting on the desk and was not locked or otherwise stored away.

¶5 Officer Spaulding took several photographs of the office and the laptop. Dozier told Officer Spaulding that the laptop belonged to Lacey; she also indicated that Lacey had never prevented or prohibited her from using it. Officer Spaulding then had Dozier fill out a consent-to-search form, listing the laptop computer as one of the items to be searched. After the form was completed and signed by Dozier and Officer Spaulding,

3

Officer Spaulding seized the laptop. At no time prior to or after seizing the laptop did Officer Spaulding personally view or search the images on the laptop, relying instead on Dozier's statements. Officer Spaulding also did not search any other areas of the house at that time, but did seize some CDs, DVDs, and associated computer equipment which was also in the office.

¶6 While Officer Spaulding was still at the house with Dozier, Lacey called. Officer Spaulding spoke directly to Lacey, identifying herself and stating that he was not to return to the house or call. Lacey appeared to understand the gravity of the situation because he told Officer Spaulding that he knew what he did was wrong.

¶7 At the time he called, Lacey was not under arrest, nor had a warrant for his arrest been issued. Concerned for his mental stability and knowing that Lacey was by himself in his car, Officer Spaulding asked Lacey if he needed to talk to somebody or wished to be taken to the emergency room at Deaconess Hospital in Billings. Lacey said that he did not need this assistance, and told Officer Spaulding that he had spoken to his father, who lived in California, as well as an attorney and would be talking to his father again soon. At no time during this conversation did Officer Spaulding ask for Lacey's consent to search or seize the laptop, and at no time did Lacey indicate that he objected to its search or seizure. Lacey later indicated that he believed this was a moot point at the time, since the laptop had already been seized, and he had been instructed not to return to the house and told that he could obtain his belongings with the assistance of the police at a later date. Officer Spaulding subsequently brought the laptop to the Billings Police

4

Department, tagged it into evidence, and wrote a report of the incident which was turned over to detectives for further investigation.

¶8 During March 2005, Lieutenant Mark Cady (Lieutenant Cady) was a sergeant and supervisor of the investigations division at the Billings Police Department. Lacey was a close personal friend of Lieutenant Cady's adult daughter Brooke, and had been to Lieutenant Cady's house on numerous occasions over a five or six year period. Lacey himself later testified that he considered Lieutenant Cady to be like a father figure to him. On the morning of March 15, 2005, Lieutenant Cady read Officer Spaulding's report and recognized that Lacey was involved. Lieutenant Cady also realized that the report contained information which needed to be assigned to a detective for further investigation. Lieutenant Cady spoke to his supervisor about the matter, and the case was assigned to Detective Michael Beckers (Detective Beckers). At the time, Lieutenant Cady told his supervisor that Lacey was a personal friend of his and that he did not want to be involved in the investigation of the case. After the case was assigned to Detective Beckers, Lieutenant Cady called Agent Dan Vierthaler (Agent Vierthaler) of the Federal Bureau of Investigation (FBI), who served with a unit that specifically worked on sex crimes involving the use of computers, videos and the Internet, in order to inform him of the case. As it turned out, Agent Vierthaler had learned of the report about Lacey from other members of the Billings Police Department the night before, and had already made arrangements to interview Dozier and her minor daughter on the morning of March 15, 2005.

¶9      Agent Vierthaler and Detective Beckers went to Dozier's house on that morning as part of a joint investigation, and interviewed Dozier and her daughter. During the interview, Dozier indicated to the officers that she, Lacey, and her children had access to all areas of the house and that none of the areas were restricted solely to Lacey. She also indicated that while the seized laptop belonged to Lacey, Lacey did not place restrictions on her ability to use it. At the time of this interview, the laptop was in police custody and had not yet been searched by any of the officers. After the interview with Dozier, Agent Vierthaler and Detective Beckers had Dozier sign a consent-to-search form for the house. Pursuant to this consent, the officers searched the entire house, including an attached garage. At no point did they encounter locked doors or containers, or find any room which appeared to be restricted solely to Lacey. By the time the officers reached the garage, it was late in the day. Because Dozier and Lacey had recently moved into the house, the garage contained a number of boxes, containers, and other items scattered about. Dozier testified that all family members had access to the garage, and that none of the boxes were private only to Lacey. In his testimony, Lacey claimed that one side of the garage was strictly reserved for his belongings which were in boxes and containers that he believed were privately his. At any rate, the garage was filled with a large amount of boxes and containers, and in order to conduct a search of the material, Agent Vierthaler and Detective Beckers called three additional detectives to assist them in the search.

¶10     The detectives and Agent Vierthaler took numerous photographs of the materials they uncovered during the course of their search of the house and the garage, and the

6

search turned up numerous items which were seized. These included a number of videotapes, and computer removable media such as floppy diskettes, CDs, and USB devices. The officers also discovered sex toys and sex devices. These latter items were of particular interest because Dozier had reported that some of these items were depicted in the pictures showing Lacey abusing her daughter. All of these materials were seized and reviewed by the detectives and Agent Vierthaler at a later time.

¶11    While the officers were conducting their search, Lieutenant Cady made attempts to locate Lacey, partly motivated by his personal relationship with Lacey, and partly motivated by his duties as a public officer. Lieutenant Cady phoned his adult daughter, Brooke, to speak with her about Lacey. Taking pains not to discuss any particulars about the incidents involving Lacey, Lieutenant Cady asked Brooke in general terms to be careful with Lacey and stated that he was going through some difficult times. Brooke informed her father that Lacey had just been at their house looking for him and seemed upset and stated that he wanted to talk to Lieutenant Cady and borrow some money. Later in the day, Lieutenant Cady spoke with Brooke again and she informed him that she had received a number of calls from Lacey which she was unable to return due to the fact that she was at work. She told her father that Lacey seemed upset and was acting weird on the messages he left her. Lieutenant Cady reiterated to Brooke that Lacey was going through some tough times at the moment, and urged her to be supportive. Again, Lieutenant Cady did not disclose to Brooke any of the details surrounding the investigation of Lacey.

¶12 After this phone call with Brooke, Lieutenant Cady became concerned about Lacey's mental state, as Brooke had mentioned that his demeanor on the phone messages led her to worry that he might attempt to commit suicide by driving his car off a cliff at the "Rims" area outside Billings. While Agent Vierthaler and Detective Beckers were still at the house, Lieutenant Cady called them to express his concerns over Lacey's personal safety. Lieutenant Cady then put out an attempt to locate, or ATL, for a welfare check on Lacey. The ATL was broadcast to city, county, and highway patrol vehicles. At that time, however, there was still no warrant issued for Lacey's arrest.

¶13 After putting out the ATL, Lieutenant Cady himself spent several hours driving around the rims area outside of Billings attempting to locate Lacey. Around 5:00 or 6:00 p.m., Lieutenant Cady abandoned his search, and returned to Dozier's house, where the detectives and Agent Vierthaler were finishing up. Lieutenant Cady expressed to the officers that whether or not they intended to arrest Lacey, it was his intent to locate Lacey and take him to Deaconess Hospital for his own safety. In his testimony, Lieutenant Cady stressed that it was not his intent at that time to arrest Lacey if he located him.

¶14 Lieutenant Cady was soon able to reach Lacey by phone. Lieutenant Cady asked Lacey if he wished to speak with him, to which Lacey responded affirmatively. Lieutenant Cady expressed concern for his safety and asked him if his "head was screwed on tight." Lacey responded that it was not, and he and Lieutenant Cady had a fairly emotional phone call. Eventually, Lieutenant Cady asked Lacey if he wished to come to his office and talk with him and the detectives. Lacey responded that he would, telling Lieutenant Cady that he could be there around 7:00 p.m. Lacey later testified that it was

his understanding based on this conversation that if he did not show up at the office, then a warrant would be put out for his arrest. Lacey testified that Lieutenant Cady told him he had spoken to the FBI and told them Lacey was a "good guy" and that there would be no need to put a warrant out for him if he would come down to the office that evening.

¶15 When Lacey arrived at the Billings police station, an officer escorted him to the an interview room on the third floor where Lieutenant Cady greeted him. Lieutenant Cady spoke with Lacey for a couple of minutes, asking him if he was okay or needed anything. Lieutenant Cady informed Lacey about the call to the Billings Police Department concerning Dozier's discovery of the images on Lacey's laptop computer. Lieutenant Cady also informed Lacey that the laptop was in the custody of the FBI and that they would be able to uncover its contents. Lieutenant Cady told Lacey that because they were friends he would not be involved in the interview, and informed him that two other officers, Agent Vierthaler and Detective Beckers, would be conducting it. Lieutenant Cady also told Lacey that it was his "one-shot deal" to speak with the officers and that they would be able to get him help. Lacey indicated that he understood at that time which pictures on the laptop the FBI would be interested in discussing. Lacey later testified that he thought the purpose of meeting Lieutenant Cady was solely to get some form of help, possibly treatment, and claimed he did not know he would be arrested when he went to the police station. Lacey claimed that when Lieutenant Cady told him the interview was a "one-shot deal," Lacey believed that he had no other choice but to meet with the officers and tell them everything he knew.

9

¶16    After Lacey's conversation with Lieutenant Cady, Agent Vierthaler and Detective Beckers came into the room and Lieutenant Cady left. Detective Beckers began by informing Lacey that they wanted to offer him some help. Detective Beckers then informed Lacey it was necessary to advise Lacey of his *Miranda* rights, by telling him that in order for them to give Lacey a chance to tell them what was "going on . . . we need to advise you of your Rights, okay?" Detective Beckers then went over a standard *Miranda* warning form with Lacey. Lacey read the form, initialed it, and indicated that he understood his rights. At this time, the following exchange occurred among Detective Beckers (indicated by the letter "Q"), Lacey (indicated by the letter "A"), and Agent Vierthaler (indicated by the letters "DV"):

> Q. If you'd read through those and just ah, read it through and if you would by each paragraph, initial it.
> A. I can exercise my Rights at any time?
> DV. You can.
> A. I talked to my parents' attorney and he says you should have an attorney present. I, I've never been through this before in my life. I mean I'm not trying to do anything to stop anything.
> Q. Okay.
> DV. Dan, I, I, I'll tell you . . .
> A. You know what I'm saying? I mean . . .
> DV. Sure.
> A. You guys have been through this more than I have that's for damn sure!
> DV. We'll tell you this, Dan.
> A. Yes sir.
> DV. Ah, since this was brought to our attention we've had the opportunity to talk to a lot of people. Ah, ah . . .
> A. Mark was saying [Dozier's daughter] and . . .
> DV. That's right. Ah, we look at this as an opportunity to hear your side, okay?
> A. Okay.
> DV. It's a one-shot deal.
> A. I understand.

10

DV. Ah, you know whether or not you want to take the opportunity it, it's purely up to you.

A. Okay.

DV. At this point we have a fair amount of information.

A. Yes sir.

DV. Ah, for obvious reasons we'd like to talk to you.

A. I understand!

DV. Usually, usually there's a reason why things happen and it's nice when we can get the full story.

A. Okay.

DV. Ah, so it's your opportunity but ah, you know you can certainly exercise those Rights and you can do that at any time, you know?

A. Okay.

DV. We can talk and if at some point you want to stop . . .

A. Well I'll, I'll sign. I will sign and I will talk.

DV. And read that over before you . . .

A. Well it says "I give up my Rights, I understand my Rights and I am willing to make this statement and answer questions. I do not want a lawyer at this time. I understand what I am doing. No promises or threats have been made to me to proceed (SIGH) against me." But I . . .

DV. Okay. That's saying that a Public Defender will be appointed for you if you don't have the money to do that. You talked about your, your parents and an attorney but that, that's just something (INAUDIBLE/ TALKING AT THE SAME TIME).

A. Well . . . this is, I'm, yeah. Okay.

DV. You understand all that?

A. Yes sir.

¶17 During the course of the interview, Lacey admitting to performing sexual acts on Dozier's minor daughter and taking pictures of them. He also admitted to possessing other child pornography which he had downloaded from the Internet. Lacey also gave the officers permission to search and seize a digital camera which was in his car. At the conclusion of the interview, Lacey was arrested and taken to the Yellowstone County Detention Facility.

¶18 On March 17, 2005, a federal magistrate granted Agent Vierthaler a federal search warrant to search the seized laptop, which at that time was in the custody of the FBI. In

support of the search warrant, Agent Vierthaler provided a narrative account of his interviews with Dozier, Lacey, and Dozier's minor daughter, and the results of the search of Dozier's house. Based on this information, Agent Vierthaler stated there was probable cause to believe that Lacey had committed felonies under federal law by receiving, possessing, or manufacturing child pornography.

¶19 On March 18, 2005, the State filed an information against Lacey charging him with one count of felony sexual intercourse without consent and two counts of felony sexual assault. Based on additional investigation, the charges against Lacey were later amended to add three counts of felony sexual intercourse without consent, and three counts of felony sexual assault. Lacey subsequently filed motions to suppress all the evidence discovered in the course of the investigation, including the statements he made to Agent Vierthaler and Detective Beckers during his interview. Lacey advanced several theories in support of his motions. First, he maintained that the laptop was illegally seized and searched in violation of his right to privacy under state and federal law, because Dozier did not own the computer and thus did not have the actual authority to consent to its search and seizure. Second, Lacey argued that the search of the garage was also illegal because his consent to search his belongings was never given. Lacey maintained that he had a right to privacy in his belongings and that his consent was required to search them in the absence of an exception to the warrant requirement. Third, Lacey argued that the statements he gave to Agent Vierthaler and Detective Beckers should be suppressed because he invoked his right to counsel at the outset of the interview. Additionally, Lacey maintained that his statements were not voluntary and

had been in fact coerced because Lieutenant Cady had used his personal relationship with Lacey to entice him to the Billings police station in order to extract his confession, and had also misrepresented the nature of the interview. Lastly, Lacey argued that all the evidence obtained from the searches and seizures, as well as statements produced against him, flowed from the initial illegal search and seizure of the laptop, and thus should be suppressed as the "fruit of the poisonous tree."

¶20 After the motions were fully briefed by Lacey and the State, the District Court held a suppression hearing on April 4 and 5, 2006. During the hearing, the District Court, Hon. G. Todd Baugh presiding, heard from Dozier, Officer Spaulding, Detective Beckers, Lieutenant Cady, Agent Vierthaler, and Lacey. After the hearing, the District Court received proposed findings of fact and conclusions of law from both Lacey and the State. On July 7, 2006, the District Court adopted the State's proposed findings of fact and conclusions of law in their entirety by oral pronouncement from the bench. The District Court did not enter a separately written order. In adopting these findings of fact and conclusions of law, the District Court concluded that Dozier did have authority to consent to the search and seizure of the laptop and the items discovered in the garage, because she had joint access to and control over these items with Lacey. Additionally, the District Court concluded that Lacey's statements were admissible because he was not subject to custodial interrogation by Agent Vierthaler and Detective Beckers. Moreover, the District Court concluded that Lacey had made a knowing, voluntary and intelligent waiver of his rights, that his statements were voluntarily made, and that he did not invoke his right to an attorney at any time during the interview. The District Court also rejected

13

Lacey's request to suppress the evidence as "fruit of the poisonous tree," concluding that all the searches and seizures in this case were lawful.

¶21 After the denial of his motion, Lacey entered into a plea agreement with the State which retained his right to appeal the denial of his motion to suppress. In exchange for pleading guilty to four counts of felony sexual intercourse without consent and two counts of felony sexual assault, the State agreed to dismiss the remaining counts of felony sexual assault. Lacey received a life sentence for one of the felony sexual intercourse without consent charges, and 130 years on the remaining felony counts.

¶22 Lacey now appeals from the District Court's denial of his motion to suppress. Lacey claims that the District Court erred in denying his motion to suppress the physical evidence (i.e., the laptop and other evidence from the garage search), as well as the testimonial evidence (i.e., statements he made during his interview) against him. Lacey also maintains that Judge Baugh's conduct during the suppression hearing and his verbatim adoption of the State's proposed findings of fact and conclusions of law constituted judicial bias which undermined his right to a fair trial and due process.

¶23 We state the issues presented by Lacey on appeal as follows:

¶24 **Issue One:** *Did the District Court err in denying Lacey's motion to suppress the physical evidence against him?*

¶25 **Issue Two:** *Did the District Court err in denying Lacey's motion to suppress the testimonial evidence against him?*

¶26 **Issue Three:** *Was there judicial bias in this case and did it deprive Lacey of his right to due process and a fair and impartial trial?*

## STANDARD OF REVIEW

¶27 We review a district court's denial of a motion to suppress in order to determine whether its findings of fact are clearly erroneous and whether its interpretation and application of the law is correct. *State v. Bieber*, 2007 MT 262, ¶ 20, 339 Mont. 309, 170 P.3d 444. To determine whether a finding of fact is clearly erroneous, we consider whether that finding is supported by substantial evidence, whether the district court misapprehended the effect of the evidence, or whether our review of the record leaves us with a definite and firm conviction that a mistake has been made. *Bieber*, ¶ 20.

## DISCUSSION

¶28 **Issue One:** *Did the District Court err in denying Lacey's motion to suppress the physical evidence against him?*

¶29 Lacey argues that the District Court erred when it failed to suppress the physical evidence seized by the officers in this case. With respect to the laptop, Lacey maintains that Dozier did not possess the requisite joint access, control, common authority, or possessory interest in the laptop in order to consent to its search and subsequent seizure. Lacey argues that under *State v. McLees*, 2000 MT 6, 298 Mont. 15, 994 P.2d 683, Dozier is required to have actual, not apparent, authority over the laptop in order to consent to its search and seizure. Lacey claims that Dozier occasionally used and accessed the laptop, but only with his permission.

¶30 Furthermore, Lacey argues that he had an actual and reasonable expectation of privacy in his computer files where the child pornography was found because he had placed them in a hidden file. Lacey argues that computers are entitled to greater

15

protection under the law of search and seizure, and points to a number of cases from various state and federal courts to support his argument. Lacey also maintains that neither Officer Spaulding nor any of the other officers ever sought his consent to search or seize the laptop. Moreover, Lacey claims that Officer Spaulding told him not to come to Dozier's house, thus precluding him from objecting to the search or seizure.

¶31 With respect to the search and seizure of his items from the garage (*see* ¶¶ 9-10), Lacey maintains that he had an expectation of privacy in his boxes and containers which were in the garage, and that Dozier did not have the required actual authority to consent to their search. He argues that his boxes were stored in a particular location in the garage and thus readily distinguishable from the other boxes, giving rise to an actual and reasonable expectation of privacy in them.

¶32 Finally, Lacey argues that the "fruit of the poisonous tree" doctrine applies in the instant case to bar the admission of the physical evidence against him. The "fruit of the poisonous tree" doctrine forbids the use of evidence which is discovered as a result of the exploitation of an initial illegal act by the police. *State v. Dasen*, 2007 MT 87, ¶ 19, 337 Mont. 74, 155 P.3d 1282 (citing *State v. Therriault*, 2000 MT 286, ¶ 57, 302 Mont. 189, 14 P.3d 444). On appeal, Lacey reiterates the argument presented in the District Court that the search of the garage, founded as it was on the illegal search and seizure of the laptop, was fruit of the poisonous tree which must be suppressed.

¶33 The State urges us to affirm. The State argues that Dozier had a possessory interest sufficient to consent to the search of the laptop, because she regularly accessed it with or without Lacey's presence and was not required to gain his permission to do so.

Further, the State points out that the laptop was not password-protected, and Dozier regularly used the laptop for personal e-mails, letters, and for storing personal videos and photos. The State argues that Dozier fits the characteristics of a co-user of the laptop with the ability to give consent to its search. The State further maintains that the District Court found Dozier's testimony regarding her use and access of the computer to be credible, and discounted Lacey's testimony that her authority to use it was limited to "casual use" and was thus insufficient to permit her to search through its files.

¶34 Additionally, the State disputes Lacey's claims that his privacy interest in the laptop is to be afforded any greater constitutional protection. The State maintains that it is necessary to assess the relative weight of those who share common authority over property based on the mutual use of such property by persons having joint control or access. While the State concedes that computers do have some unique privacy considerations, it discounts the notion that those considerations are operative in this case given Dozier's use of the laptop, the fact that neither the laptop, nor the specific files themselves were password-protected, and because the laptop itself was not locked or otherwise prohibited to Dozier. In this connection, the State notes that Lacey willingly helped Dozier retrieve a deleted file during their initial phone conversation. The State further argues that Lacey was not precluded from objecting to the search and seizure of the laptop, noting the lack of evidence that the officers actually prohibited Lacey from at least voicing an objection to the search and seizure of the laptop.

¶35 With regards to the garage search, the State argues that Lacey failed to evince the requisite actual expectation of privacy in his items because he allowed Dozier and the

friends who helped them move to haphazardly pack the items from their former residence and place them in the garage. The items in the garage were disorganized and intermingled; none of Lacey's containers or boxes were tied, taped shut, locked or labeled, and many of them were simply open. In this regard, the State argues that Lacey's assertions that his boxes were identifiable and distinguishable as belonging to him are based solely on his own testimony which the District Court did not find credible in light of the testimony of Dozier and the officers involved in the search. The State argues that this Court should not disturb these credibility findings on appeal since Lacey has not asserted that any of the District Court's findings of fact were clearly erroneous. Based on these facts, the State claims that Dozier did have common authority to consent to the search of the garage.

¶36 Finally, the State argues that the fruit of the poisonous tree doctrine is inapposite in the instant case. Citing to *State v. New,* 276 Mont. 529, 917 P.2d 919 (1996), the State notes that "fruit" or derivative evidence is admissible if it is either attenuated from the constitutional violation so as to remove its primary taint, obtained from an independent source, or if it would have been inevitably discovered apart from the constitutional violation. In this case, the State notes that Dozier saw evidence of a crime while accessing the laptop separate and apart from any police involvement; thus, her discovery was a wholly private action which cannot trigger the exclusionary rule.

## A. Search of the Garage

18

¶37 The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect the citizens of this state from unreasonable searches and seizures. "Warrantless searches conducted inside a home are *per se* unreasonable, subject only to a few specifically established and well-delineated exceptions." *McLees*, ¶ 10 (alteration and quotations omitted). One such exception is when consent to search is "freely and voluntarily given." *McLees*, ¶ 10 (quotation omitted). When the State seeks to justify a warrantless search based on voluntary consent, it has the burden of proof and may either show that consent was given by the defendant herself, or " 'that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.' " *McLees*, ¶ 10 (quoting *State v. Sorenson*, 180 Mont. 269, 275, 590 P.2d 136, 140 (1979)). As we further stated in *McLees*,

> "[c]ommon authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

*McLees*, ¶ 13 (quoting *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974)).

¶38 In *McLees*, we explicitly held that a third party can only consent to the search of another's property if she has actual authority to do so. *McLees*, ¶ 32. In that case, the

19

Madison County Sheriff's office received reports of two burglaries and thefts and commenced an investigation. The investigation led them to suspect that Travis McLees (Travis) was involved in the incidents. Travis lived with his father in Three Forks, Montana, in an apartment which was owned by his grandfather Earl McLees (Earl), who lived next to the apartment. An officer went to Travis's residence and spoke to Earl, and asked Earl if he could enter the apartment. Earl gave him permission to do so. When the officer and Earl attempted to enter the front door of the apartment, they found it locked. Because Earl did not have a key to the front door, they were forced to enter through an unlocked door which led from an adjoining building to the apartment. *McLees*, ¶ 5.

¶39 Inside, the officer discovered drug paraphernalia and items which he believed were stolen. After Earl signed a consent-to-search form for the whole apartment, additional officers were called to the scene to assist. *McLees*, ¶¶ 6-7. As a result of the investigation, Travis was charged with several crimes and convicted. Prior to his conviction, Travis moved to suppress the evidence seized from his apartment. The motion was denied by the district court.

¶40 On appeal, we reversed the denial of Travis' motion to suppress, concluding that Earl did not have actual authority to consent to the search of Travis's apartment. In holding that Earl possessed authority to consent to the search, the district court had relied on the fact that Travis did not pay rent or utilities, had no rental agreement with Earl, did not furnish the apartment, and kept his belongings in duffel bags while his father, who lived in the apartment with him, kept his items in dresser drawers. *McLees*, ¶ 16. We rejected these factors as indicating actual authority, and instead found that no "mutual use

20

of the property" or "joint access and control for most purposes" was presented which would create common authority on Earl's behalf to consent to a search. *McLees*, ¶ 17. We noted that Earl did not enter the apartment if Travis or his father were not there, did not have free access to the apartment, and would have to knock before entering. Thus, Earl was clearly not a cohabitant of the apartment, did not share in its use, and thus could not consent to a search. *McLees*, ¶ 17. Furthermore, we rejected the argument that Earl's ownership of the apartment and his limited access in order to visit Travis's father gave rise to common authority, noting that such access was limited to those particular activities and did not expand further. *McLees*, ¶ 18.

¶41 Lacey argues that Dozier lacked the authority to consent to the search of his belongings which were located in the garage under the authority of *McLees*. We disagree. As the State points out, Lacey has not alleged that any of the District Court's findings of fact were clearly erroneous. Those findings, based on the testimony of Dozier and the officers involved in the search, indicated that none of Lacey's possessions were specifically marked, labeled, locked, or set in a separately identifiable part of the garage. Moreover, Dozier testified that all the family members' items were mixed in the garage, and that she and her children had full access to the garage and its contents. The facts of the present case are clearly distinguishable from *McLees* and Dozier had sufficient common authority to consent to their search. By allowing his items to remain co-mingled, unmarked, and unlocked in a common area in a house he shared with Dozier which was rented in her name alone, Lacey assumed the risk that Dozier could in fact assert control over those items at any time.

¶42    For these reasons, therefore, we affirm the District Court's denial of Lacey's motion to suppress the evidence seized during the search of the garage.

## B. Search and Seizure of the Laptop

¶43    As an initial matter, it is critical to note that the laptop was not searched based on Dozier's consent. Dozier gave consent to Officer Spaulding to seize the laptop, but the laptop was searched pursuant to a federal search warrant later obtained by Agent Vierthaler, and not upon Dozier's consent. This search warrant was granted two days after the laptop itself had been seized and was already in FBI custody.

¶44    In the application for the search warrant, Agent Vierthaler cited information gleaned during his interviews with Dozier and her minor daughter, the interview he and Detective Beckers conducted with Lacey, as well as evidence discovered in the search of the garage. As the State notes, the validity of this search warrant has not been challenged on appeal. A review of the application for the federal search warrant demonstrates that the interviews with Dozier, her minor daughter, and Lacey himself (wherein he admitted that he stored images of child pornography and images of himself committing sexual acts upon Dozier's minor daughter on the laptop), as well as evidence discovered in the garage search, provided the necessary probable cause for the search warrant with respect to the laptop.[1]    Therefore, the pertinent inquiry with respect to the laptop is whether Dozier had sufficient authority to consent to its *seizure* by Officer Spaulding.

---

[1]    Later in this Opinion, we conclude that Lacey's statements were voluntary, and that he knowingly, intelligently, and voluntarily waived his right to counsel in making those statements to Detective Beckers and Agent Vierthaler.

22

¶45    Both Article II, Section 11 of the Montana Constitution and the Fourth Amendment to the United States Constitution protect against unreasonable searches and seizures. There is a distinction between search and seizure as noted by the Illinois Court of Appeals in *People v. Blair*, 748 N.E.2d 318 (Ill. App. 3 Dist. 2001), a case relied upon by Lacey. In that case, police officers had arrested defendant Blair for disorderly conduct while he was videotaping children at a zoo in Rock Island County, Illinois. After Blair's arrest, officers went to his residence and were greeted by Blair's father, Howard Blair (Howard). Officers were allowed inside by Howard, and then asked if they could search some of Blair's belongings. Howard led the officers to the basement where Blair stored some of his belongings. In the basement officers came upon a computer owned by Blair. At the time, Howard stated that he had no ownership interest whatsoever in the computer. Nevertheless, the officers turned it on and began searching it. The officers later stated that they believed they had Howard's permission to turn on the computer.

¶46    In the course of their search, the officers discovered internet bookmarks with references to teenagers which they believed indicated the computer contained child pornography. They seized the computer. The officers later testified that Howard gave them permission to seize it, but Howard's recall of the events was not clear. Evidence later discovered on the computer led to Blair being charged with 16 counts of possessing child pornography. Prior to trial, Blair moved to suppress the evidence discovered on the computer. His motion was denied and he was later convicted in a bench trial, preserving his right to appeal the denial of his motion to suppress.

23

¶47    The Illinois Court of Appeals reversed the denial of Blair's motion to suppress. First, citing to *Arizona v. Hicks*, 480 U.S. 321, 107 S. Ct. 1149 (1987), the court noted that police officers must have probable cause to effect a seizure in the absence of either consent or a warrant. The court found probable cause was lacking because Blair's arrest for disorderly conduct and the internet bookmarks with references to teenagers were considered too ambiguous to give rise to probable cause. *Blair*, 748 N.E.2d at 323.

¶48    Additionally, the court rejected the argument that Howard could have given consent to the seizure of the computer. Because the court's treatment of this subject is instructive in the instant case, we quote it at some length:

> A third party may consent to a search if he has common authority over, or other sufficient relationship to, the premises or effects to be searched. *Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242. In the case at bar, however, we must decide, not whether a third party's common authority gives him the power to consent to a search, but whether that authority may permit government seizure of the property. This issue has received scant judicial attention. See *United States v. Woodrum*, 202 F.3d 1 (1st Cir. 2000) (third-party consent has been invoked only to validate warrantless searches of property, not seizures). Perhaps this is so because third-party consent is often superfluous where the incriminating character of an item is apparent, allowing it to be seized pursuant to the plain view doctrine without consent or a warrant. See, *e.g., United States v. Smith*, 27 F.Supp.2d 1111 (C.D.Ill. 1998) (police could seize computer pursuant to plain view doctrine where police discovered child pornography while conducting search authorized by third party); see also *State v. Ready*, 148 Or.App. 149, 939 P.2d 117 (1997) (police could seize videotapes labeled "kid porn" pursuant to plain view doctrine during valid third-party consent search). As noted previously, however, the police in the instant case lacked probable cause to believe that defendant's computer contained contraband or was otherwise connected with a crime. Accordingly, the question of third-party consent to seize is foursquarely before this court.

.   .   .

24

Measuring a third party's authority to consent by a suspect's expectation of privacy is consistent with the idea that the Fourth Amendment's guarantee of freedom from unreasonable searches protects against unreasonable government intrusions upon privacy (*Katz. v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Nevertheless, it should be remembered that the Fourth Amendment not only guarantees freedom from unreasonable searches, but freedom from unreasonable seizures. *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). This latter guarantee protects against unreasonable government interference, not with privacy alone, but with possessory interests in property. *Soldal v. Cook County*, 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). Moreover, the right to retain possession of property against unreasonable deprivation is not inferior to the right to maintain privacy. *Soldal*, 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450.

The rationale for third-party consent searches resting, as it does, upon the diminished expectation of privacy attending a third party's common authority over the premises or effects to be searched, does not provide a sufficient basis for a third party's consent to the seizure of another's personal effects. While one who permits a third party access or control over his property has a diminished expectation of privacy, the third party's access or control does not similarly diminish the owner's expectation that he will retain possession of his property.

A third party having common authority over premises or effects may permit a search of the premises or effects in his own right. *Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242. In such a case, the third party is permitting others to do no more than the third party may do on his own, *i.e.,* inspect the premises or effects. However, a third party may not in his own right consent to depriving the owner of possession of his property. The third party could not in his own right lawfully exclude the owner from possession of the property. Accordingly, the third party cannot permit others to do what he himself has no right to do.

*Blair*, 748 N.E.2d at 324-25.

¶49    Based upon the foregoing authorities and analysis, we conclude that Dozier did not have the right or authority to consent to the seizure of Lacey's computer. Thus, we turn to the question of whether, absent the owner's consent, the officer had probable cause to seize the laptop. *Arizona,* 480 U.S. at 326-27, 107 S. Ct. at 1153.

25

¶50 Officer Spaulding did not herself see any pornographic images on Lacey's laptop. If Dozier had left one of the pornographic images on the computer screen when Officer Spaulding entered the room, then the plain view doctrine would arguably apply, supplying probable cause for the seizure. However, Officer Spaulding had only Dozier's statements that such contraband was on the computer, and did not personally see it herself. Thus, the question remains as to whether Dozier's statements, by themselves, were sufficient to establish the probable cause necessary to seize the laptop in the first place.

¶51 "Probable cause to seize property exists when the facts and circumstances within an officer's knowledge are sufficient to warrant a reasonable person to believe that another person has committed an offense." *State v. Branam*, 2006 MT 300, ¶ 22, 334 Mont. 457, 148 P.3d 635. In this case, the District Court did not make any findings as to whether Officer Spaulding had probable cause to seize the laptop. Instead, the District Court, in its verbatim adoption of the State's proposed findings of fact and conclusions of law, focused solely on whether Dozier had authority to consent to a search of the laptop. However, because officers did not search the laptop based upon Dozier's consent, but rather based upon the federal search warrant obtained by Agent Vierthaler, this analysis is misplaced. The question of whether Dozier could consent to a search of the laptop is immaterial to whether she could consent to its seizure.

¶52 Arguably, Dozier's statement to Officer Spaulding that she had observed images on the laptop showing Lacey sexually abusing her minor daughter was sufficient, by

26

itself, to demonstrate probable cause to seize the laptop. However, even if Officer Spaulding lacked probable cause to seize the laptop, it is clear under the circumstances presented here that the evidence later discovered on the laptop pursuant to the federal search warrant is admissible under the "inevitable discovery" exception to the fruit of the poisonous tree doctrine. Thus, the District Court did not err in denying Lacey's motion to suppress this evidence.

¶53 As noted above, the fruit of the poisonous tree doctrine forbids the use of evidence which is discovered as a result of the exploitation of an initial illegal act by the police. *Dasen*, ¶ 19. Montana follows federal law in recognizing three exceptions to this doctrine, providing that evidence is admissible if it is: (1) attenuated from the constitutional violation so as to remove its primary taint; (2) obtained from an independent source; or (3) determined to be evidence which would have been inevitably discovered apart from the constitutional violation. *Dasen*, ¶ 19. We examine the exceptions in turn.

¶54 Exception one would be clearly inapplicable under the present circumstances due to the proximity of the laptop seizure and the search of the house and interviews of Dozier, her minor daughter, and Lacey the next day. *See Therriault*, ¶ 60. Exception two, the "independent source," applies in those circumstances where law enforcement possessed an independent source of information which would have led to the evidence, or were engaged in an investigation which would have led to the evidence. *Therriault*, ¶ 60 (citing *New*, 276 Mont. at 537, 917 P.2d at 924). While "independent source" could feasibly apply, we noted in *Dasen* that "genuine independence 'may well be difficult to

establish where the seized goods are kept in the police's possession.' " *Dasen*, ¶ 20 (quoting *Murray v. United States*, 487 U.S. 533, 542, 108 S. Ct. 2529, 2535 (1988)).

¶55     This leaves the third exception to the fruit of the poisonous tree doctrine known as "inevitable discovery." Under this exception "evidence initially obtained illegally by the State may nevertheless be used against a defendant in a criminal proceeding where it can be shown that the evidence would have been inevitably discovered despite a constitutional violation." *State v. Notti*, 2003 MT 170, ¶ 20, 316 Mont. 345, 71 P.3d 1232 (citing *State v. Pearson*, 217 Mont. 363, 704 P.2d 1056 (1985)). We apply the inevitable discovery exception sua sponte, provided there is a sufficient record before us to conclude that the evidence would have been inevitably discovered pursuant to the execution of a valid search warrant. *State v. Dickinson*, 2008 MT 159, ¶ 24, 343 Mont. 301, 184 P.3d 305.

¶56     Here, the record before us leaves no doubt that the evidence on the laptop would have been inevitably discovered even if Officer Spaulding had not initially seized the laptop after speaking with Dozier. If Officer Spaulding had left the laptop at Dozier's house, then the evidence discovered during the search of the garage the next day, as well as the statements made by Dozier, her minor daughter, and Lacey during their interviews with law enforcement, would have provided probable cause to seize the laptop. Even putting aside for the moment Lacey's admissions, Dozier identified some of the sex toys and sex devices found in the garage as those she had seen in the computer images of Lacey committing sexual acts on her minor daughter. Thus, we conclude that the evidence would have been lawfully discovered in any event; therefore, the District Court

28

did not err in denying Lacey's motion to suppress the evidence obtained from the seizure and search of the laptop.

¶57 **Issue Two:** *Did the District Court err in denying Lacey's motion to suppress the testimonial evidence against him?*

¶58 Lacey argues that the District Court erred in denying his motion to suppress the testimonial evidence against him because: (1) he was subject to custodial interrogation by Agent Vierthaler and Detective Beckers; (2) he invoked his right to counsel during the interrogation, and did not voluntarily, intelligently, and knowingly waive that right; and (3) his confession was coerced and not voluntarily given. Accordingly, Lacey argues that all the testimonial evidence taken from his custodial interrogation should be suppressed pursuant to his constitutional rights against self-incrimination under Article II, Section 25 of the Montana Constitution and the Fifth Amendment to the United States Constitution. We disagree and affirm the District Court's denial of Lacey's motion to suppress.

¶59 The right against self-incrimination applies to bar the use of statements obtained from a custodial interrogation "unless the defendant is warned, prior to questioning, that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *State v. Olson*, 2003 MT 61, ¶ 13, 314 Mont. 402, 66 P.3d 297 (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966)). Persons are considered to be "in custody" and entitled to *Miranda* warnings "if they have been deprived of their freedom of action in any significant way or their freedom of action has been curtailed to a degree associated with a formal arrest." *State v. Munson*, 2007 MT 222, ¶ 21, 339 Mont. 68, 169 P.3d 364

29

(quotation omitted). Whether a custodial interrogation has occurred is determined on a "case-by-case basis" and focuses on whether, under the circumstances, a reasonable person would feel free to leave. *State v. Reavley*, 2003 MT 298, ¶ 19, 318 Mont. 150, 79 P.3d 270. We examine the following factors to determine whether a custodial interrogation has occurred:

> "(1) place of the interrogation; (2) time of the interrogation; (3) persons present during the interrogation; (4) whether *Miranda* warnings were gratuitously given; (5) the length and mood of the interrogation; and (6) whether or not the suspect was arrested following the interrogation."

*Reavely,* ¶ 19 (quoting *Olson*, ¶ 15).

¶60 If a custodial interrogation has taken place and a subject has been properly informed of his *Miranda* rights, an individual may waive those rights by a waiver which is made voluntarily, knowingly, and intelligently. *State v. Gittens*, 2008 MT 55, ¶ 14, 341 Mont. 450, 178 P.3d 91. The State has the burden of proving that the waiver of the right against self-incrimination has met this standard. *Gittens*, ¶ 14.

¶61 Finally, a defendant may move to suppress an admission or confession on the grounds that it was involuntary. Section 46-13-301, MCA; *State v. Maestas*, 2006 MT 101, ¶ 17, 332 Mont. 140, 136 P.3d 514. The determination of whether a confession is voluntary is a factual inquiry which takes into account the totality of the circumstances, focusing on whether the suspect's confession was the product of free choice or compulsion. *State v. Scarborough*, 2000 MT 301, ¶ 31, 302 Mont. 350, 14 P.3d 1202. When considering the totality circumstances, courts consider a number of factors

including "the defendant's age and level of education; the length and method of the interrogation; whether the defendant was advised of his or her *Miranda* rights; the defendant's prior experience with the criminal justice system and police interrogation; the defendant's background and experience; and the defendant's demeanor, coherence, articulateness, and capacity to make full use of his or her faculties." *Scarborough*, ¶ 32.

¶62 In the State's proposed findings of fact and conclusions of law, it asserted that Lacey was not subject to custodial interrogation under the six *Reavley* factors. The State asserted that factor one weighed in its favor because while the questioning did occur at the Billings police station, Lacey voluntarily drove himself there and was not accompanied by an officer, or forced to go there in any way. The State argued that factor two also weighed in its favor because the questioning took place at 7:20 p.m., at a time when Lacey was lucid and articulate. Under factor three, the State argued that there were only two plain clothes officers present during the interrogation, they were polite and cordial during the questioning, and did not resort to a "good cop/bad cop" routine. Under factor four, the State asserted that because Lacey was given his *Miranda* rights, this factor weighed in its favor as well. Turning to factor five, the State noted that the interrogation lasted only 65 minutes and that the atmosphere was not coercive or threatening, given that the officers took steps to make sure Lacey was comfortable, did not handcuff or restrain him, and made him aware that he could exercise his *Miranda* rights and stop the interview at any time. Finally, while the State acknowledged under factor six that Lacey had been arrested, it suggested this factor should be accorded little

31

weight because Lacey's arrest only occurred after he made incriminating statements and admitted molesting Dozier's minor daughter.

¶63    As noted above, the District Court adopted these proposed findings of fact and conclusions of law verbatim from the bench without entering a separate written order. As we have previously stated, we "disapprove, heartily and stoutly" of this practice. *Sawyer-Adecor Intl., Inc. v. Anglin*, 198 Mont. 440, 447, 646 P.2d 1194, 1198 (1982). More to the point, we conclude that the State's proposed conclusions of law on the issue of whether a custodial interrogation occurred here are incorrect. First, factor one focuses on the "place of interrogation," not how the suspect got there. In this case, it took place at the Billings police station, and undoubtedly weighs in favor of a custodial interrogation. Under factor two, we agree with the State that the time of the interrogation, around 7 p.m., weighs against finding a custodial interrogation as it is a reasonable hour. Under factor three, the "persons present" in this case were two plain clothes police officers. Lacey was surprised by their presence, and commented that they seemed "big." This factor, however, does not definitely weigh either for or against a finding of custodial interrogation. Factor four, however, clearly does weigh in favor of finding a custodial interrogation. Based on the transcript, it is patent that Detective Beckers did not give the *Miranda* warnings gratuitously, but out of necessity. As reflected in the transcript, Detective Beckers told Lacey that in order to give him a chance to tell them what was "going on . . . we need to advise you of your Rights, okay?" Under factor five, however, we do agree with the State that the interrogation was not excessively long and that, based on the transcripts, it does not appear to have been confrontational or coercive in nature.

32

Thus, this factor would weigh against finding a custodial interrogation. Factor six, on the other hand, weighs in favor of finding a custodial interrogation. This factor does not focus on whether there was justification for the arrest, but simply considers whether the suspect was in fact arrested after the interrogation. The fact of an arrest after questioning makes it likely that the questioning was custodial in nature to begin with.

¶64 In determining whether a custodial interrogation has occurred, the inquiry is ultimately an objective one to determine " 'whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *Munson*, ¶ 24 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995)). Here, there is little doubt that a reasonable person in Lacey's shoes would not have felt free to get up, terminate the encounter, and leave the Billings police station. Thus, the District Court erred in adopting the State's position that Lacey was not subject to custodial interrogation.

¶65 Because Lacey was subject to custodial interrogation, he must have been advised of his *Miranda* rights and knowingly, voluntarily, and intelligently waived those rights for the State to use his statements against him. Here, we find that both conditions have been satisfied. As the waiver of rights form and transcript cited above make clear (*see* ¶ 16), Lacey was advised of his rights, including his right to stop the questioning at any time and have an attorney present during his questioning. Nevertheless, he agreed to sign the waiver of rights form giving up those rights, and specifically stated that he would sign the form, that he would talk, and that he did not want "to do anything to stop anything."

These statements indicate that he understood those rights, knowingly and intelligently waived them, and agreed to make statements to the officers.

¶66 Lacey also argues that his waiver and subsequent confession were not voluntary and were in fact coerced. He maintains that Lieutenant Cady used his personal relationship to entice Lacey to come into the police department and then turned him over to Detective Beckers and Agent Veirthaler for questioning. He claims that both Lieutenant Cady and Agent Vierthaler made a false promise to Lacey, telling him that his opportunity to confess was a "one-shot deal" and that if he did not confess he would lose his opportunity to talk with the officers. He also claims that he was under substantial emotional distress at the time, and that Lieutenant Cady exploited his personal relationship with him to gain his confession.

¶67 The question of voluntariness depends on the totality of the circumstances, considering the characteristics of the defendant and what transpired during the interview. *State v. Hill*, 2000 MT 308, ¶ 39, 302 Mont. 415, 14 P.3d 1237. Here, we agree with the State that the totality of the circumstances show that the waiver and subsequent confession were a product of Lacey's own free will, and not the product of coercion. First, although Lieutenant Cady did use his personal relationship to bring Lacey to the police station, he never threatened or intimidated him into doing so. Lacey voluntarily drove himself to the Billings police station with full knowledge that officers were investigating the allegations that he sexually abused Dozier's minor daughter. Once there, he was informed that he had a "one-shot deal" to speak directly with the officers

34

and tell his side of the story. Regardless of whether or not this would ultimately turn out to be the case, this type of statement, under these circumstances, does not constitute a threat, deception, or an attempt to overpower Lacey's will in an effort to get him to confess. Moreover, as noted above, the mood of the interrogation as reflected in the transcript was not overbearing or misleading; the officers were polite with Lacey and did not threaten him at any time. Finally, it is clear that Lacey is an intelligent individual, that he was not suffering from any mental impairments or mental health issues, and that he was not intoxicated at the time of the interrogation. While Lacey was likely in an intense emotional state at the time, there is no indication that officers took advantage of this state in order to manipulate him and coerce his confession. Thus, we conclude the waiver of rights and confession were voluntary.

¶68 While Lacey also argues that he made a clear request for counsel during his interrogation, we see no evidence of this in the record. Once a suspect waives his or her right to counsel, he may invoke that right and stop the questioning at any time. *Maestas*, ¶ 13. However, the request for counsel must be unequivocal and an ambiguous or equivocal reference to an attorney does not require the police to cease questioning the suspect. *Maestas*, ¶ 15. "[A] suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity . . . [the officer is not required to] stop questioning the suspect.' " *Maestas*, ¶ 19 (quoting *State v. Simmons*, 2000 MT 329, ¶ 21, 303 Mont. 60, 15 P.3d 408). Such requests for counsel do not depend on the use of any particular words and are

35

"construed broadly." *State v. Clark*, 2008 MT 419, ¶ 30, 347 Mont. 354, 198 P.3d 809 (quotation omitted). For instance, statements such as "Shit, I need a lawyer, man" and "I would like to talk to somebody" are sufficient to meet this standard. *Clark*, ¶ 30.

¶69 Here, Lacey's references to an attorney did not meet the "requisite level of clarity" to invoke his right to counsel. Lacey did not express a desire to speak with an attorney or to consult with someone other than the officers during the interrogation. In fact, his most direct statement on this issue was the following: "I talked to my parents' attorney and he says you should have an attorney present. I, I've never been through this before in my life. I mean I'm not trying to do anything to stop anything." These equivocal statements were not sufficient to invoke Lacey's right to counsel, thus requiring the officers to cease all further questioning.

¶70 While we have concluded that Lacey was subject to custodial interrogation, we nonetheless hold that the District Court did not err in denying Lacey's motion to suppress the testimonial evidence against him because the District Court did correctly conclude that Lacey was properly advised of his *Miranda* rights, knowingly and intelligently waived those rights, and that his waiver and subsequent confession were voluntary.

¶71 **Issue Three:** *Was there judicial bias in this case and did it deprive Lacey of his right to due process and a fair and impartial trial?*

¶72 Finally, Lacey argues that Judge Baugh demonstrated judicial bias during the suppression hearing, thus depriving him of his right to due process and a fair trial. Lacey notes that judges are to avoid "officious interference" in judicial proceedings, must maintain impartiality at all times in both their demeanor and their actions, and should not

36

become advocates for any particular party. Lacey argues that Judge Baugh ran afoul of this principle due to what Lacey terms his "excessive interruption of defense counsel and improper questioning of both defense counsel and Lacey." Lacey points to several instances in the suppression hearing transcript where Judge Baugh either directly questioned Lacey or challenged the feasibility of the explanations he gave for his conduct. In particular, Judge Baugh questioned Lacey about his initial discussion with Officer Spaulding in which he was told not to return to Dozier's house, about the fact that he did not raise an objection to the search of the house or seizure of his laptop, and about his subsequent decision to drive down to the Billings police station to meet with Lieutenant Cady and his expectations concerning whether he would be arrested there. Lacey also notes that his trial counsel had to object to Judge Baugh's questioning of Lacey on three occasions. Lacey argues that these actions show Judge Baugh's bias in favor of the State, and demonstrate that he was deprived of an impartial hearing. Further, Lacey argues that this bias was confirmed, and his constitutional rights further impaired, by Judge Baugh's verbatim adoption of the State's proposed findings of fact and conclusions of law.

¶73 We agree with Lacey that judges should not interfere in proceedings, must remain impartial, and should not become advocates for any particular party. *State v. Skinner*, 2007 MT 175, ¶ 36, 338 Mont. 197, 163 P.3d 399; *State v. Stafford*, 208 Mont. 324, 331, 678 P.2d 644, 648 (1984). Yet, as the State points out, judges may in fact question witnesses. M. R. Evid. 614(b); *State v. Hibbs*, 239 Mont. 308, 311, 780 P.2d 182, 184 (1989). Had these particular instances of conduct occurred in front of a jury, they may

37

have raised significant concerns. However, this was a suppression hearing where Judge Baugh was the finder of fact. Moreover, while Lacey's trial counsel did object to Judge Baugh's questioning, she did not move to terminate the hearing or disqualify Judge Baugh. Further, a review of the transcripts of the suppression hearing in its entirety establishes that Judge Baugh did give Lacey a fair hearing and presented him with the opportunity to fully argue his motion to suppress.

¶74 In his reply brief, Lacey suggests this Court has the discretion to review his claimed errors of judicial bias under the plain error doctrine. *See State v. English*, 2006 MT 177, ¶ 66, 333 Mont. 23, 140 P.3d 454. We invoke the doctrine of plain error only "sparingly" and on a "case-by-case" basis, when failure to do so may result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of the proceedings, or compromise the integrity of the judicial process. *English*, ¶ 66. None of these concerns are present here, and we decline to review Lacey's claimed errors under the plain error doctrine.

## CONCLUSION

¶75 We conclude that the District Court did not err in denying Lacey's motion to suppress the physical and testimonial evidence against him. While we do conclude that Lacey was subject to custodial interrogation, we also determine that he knowingly, intelligently, and voluntarily waived his constitutional rights, and made a voluntary confession. Finally, we reject Lacey's claims of judicial bias. Thus, we affirm his conviction.

/S/ PATRICIA COTTER

We concur:

/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS

Justice Jim Rice, concurring.

¶76    I concur with the Court's holding on all issues herein, but would affirm two issues under alternative rationales.

¶77    Under Issue 1B, search and seizure of the laptop, the Court examines the difference between the third-party consent necessary for a search and the third-party consent necessary for a seizure, relying upon the discussion of that issue in *People v. Blair*. The Court explains, in ¶ 49, that this issue arises here because 1) Officer Spaulding did not personally observe the pornographic images on the laptop and thus could not seize the computer under the plain view doctrine, and 2) "the question remains" whether Dozier's statements were sufficient to establish the probable cause necessary to seize the laptop. Indeed, the discussion in *Blair* was premised upon the fact that police there "lacked probable cause to believe that defendant's computer contained contraband

or was otherwise connected with a crime." *Blair*, 748 N.E.2d at 324. However, unlike *Blair*, I do not believe probable cause is lacking in this case, which would necessitate reaching the issue of consent for the seizure. And, though the Court explains that the question of whether Dozier could *consent* to a search of the laptop may be immaterial to whether she could consent to its seizure, that distinction should not be taken to mean that facts which demonstrate *probable cause* for a search cannot also be used to demonstrate probable cause for a seizure.

¶78 Here, I believe Dozier's statements to police did establish probable cause for the seizure. Although the District Court's conclusions of law did not address whether Officer Spaulding had probable cause to seize the laptop, its findings of fact were nevertheless directly applicable to that issue. The court found that Dozier turned on the computer and observed multiple photographs of Lacey engaged in explicit sexual activities with her own daughter. The court described the photographs in graphic detail, and found that Dozier had reported this information to Officer Spaulding. Thus, Dozier's actions and observations established probable cause for the seizure. *See Branam*, ¶ 22. The Court acknowledges that this is "arguably" so in ¶ 52, but leaves this issue unresolved in favor of determining that the evidence was properly seized under the "inevitable discovery" doctrine. I would resolve the seizure issue based upon probable cause, leaving both the consent and inevitable discovery analyses for another case.

¶79 Under Issue 2, I disagree with the Court's conclusion that the District Court erred in determining that Lacey was not subjected to a custodial interrogation. Lacey voluntarily drove himself to the police station, parked his car in the parking garage, and

40

entered the lobby where he had to wait for an officer to let him into the station because it was after hours and the door was locked. Lacey arrived there of his own volition. As the Court notes, "Cady asked Lacey *if he wished* to come to his office and talk with him and the detectives. Lacey responded that he would, telling Lieutenant Cady that he could be there around 7 p.m." *Opinion*, ¶ 14 (emphasis added). The mood of the interview was cordial, with no use of intensive interrogation tactics. There was no "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest" until the officers actually placed him under arrest, subsequent to his confessing to the crime. *Munson*, ¶ 24.

¶80 These facts are similar to those we relied upon in *State v. Reavley* to conclude that the defendant was not subject to a custodial interrogation. In *Reavley*, the defendant was also invited to come down to the station to talk to officers, and he did so. Like Lacey, Reavley chose the date and the time. *Reavley*, ¶ 22. Reavley arrived of his own volition, as here. *Reavley*, ¶ 23. The mood of Reavley's interrogation was cordial, as here. Officers were wearing plain clothes, as here, and offered Reavley something to drink, as the officers did Lacey. *Reavley*, ¶¶ 24, 27. Lacey's testimony that he thought he would be arrested if he did not go to the station voluntarily, and that he did not understand he would be arrested after confessing, was found to be "not credible" by the District Court. While Reavley was not arrested afterwards, as Lacey was, Reavley did not clearly confess to the crime during his statement to police, while Lacey did. At that point, an arrest was made and the issue of custody changed.

¶81 Therefore, I agree with the Court's ultimate conclusion to affirm the District Court's denial of Lacey's motion to suppress his statement, but I would do so on the ground that the District Court did not err by concluding that Lacey was not subjected to a custodial interrogation.


/S/ JIM RICE