DA 11-0696

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 253

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JIMMIE LEE AKER,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Third Judicial District,
In and For the County of Powell, Cause No. DC 10-32
Honorable Brad Newman, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Wade Zolynski, Chief Appellate Defender; Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General; Tammy K Plubell, Assistant Attorney General; Helena, Montana

          Lewis K. Smith, Powell County Attorney; Deer Lodge, Montana

          Dan Guzynski, Joel Thompson, Assistant Attorneys General, Special Deputy County Attorneys; Helena, Montana

Submitted on Briefs:  February 20, 2013

Decided:  September 4, 2013

Filed:

_____
                    Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1    Jimmie Lee Aker appeals the judgment entered by the Montana Third Judicial District Court, Powell County, after a jury convicted him of sexual intercourse without consent following a four-day trial in May 2011.  Aker appeals his conviction on the grounds that the prosecutor committed plain error during closing argument and that Aker's counsel provided ineffective assistance during the trial.  We affirm.

¶2    We address the following issues on appeal:

¶3    1.  *Whether plain error review should be exercised to grant Aker a new trial on his claim of prosecutorial misconduct during closing arguments.*

¶4    2.  *Whether Aker received ineffective assistance of counsel due to his counsel's failure to object to hearsay testimony that bolstered the victim's credibility.*

## PROCEDURAL AND FACTUAL BACKGROUND

¶5    On June 10, 2010, the Powell County Attorney filed an information charging Aker with one count of sexual intercourse without consent, a felony, in violation of § 45-5-503(1), MCA, and two misdemeanor charges that are not at issue in this appeal.  The felony count alleged that between November 1, 2009, and December 31, 2009, Aker engaged in sexual intercourse without consent with C.Y.  The date of the offense was in dispute, but alleged to have been near C.Y.'s twelfth birthday, which was in late November 2009.

¶6    As is common in cases alleging sexual contact with a minor child, the defendant was well known to the alleged victim and there were no eyewitnesses to the event.  As

2

such, the outcome of the trial depended on who the jury believed. Each party called numerous witnesses in its case in chief and both sides conducted vigorous cross-examination in order to undermine the other's theory.

¶7      At trial, C.Y. testified that in November or December of 2009, she was babysitting L.L., her cousin, and several other small children, at her cousin's house. When she arrived at the house, L.L.'s mother Amie and stepfather Donald, as well as two other adults, were making dinner for the children. At some point after dinner, all of the adults left the house, leaving C.Y. in charge. After C.Y. had put the children to sleep, she testified that she went downstairs to watch a Hannah Montana television show.

¶8      Aker previously had dated C.Y.'s aunt, and C.Y. testified that "he was like an uncle" to her. While C.Y. lay on the couch watching television in her pajamas, Aker entered the room. C.Y. testified that he walked over to her, pulled down her pajama pants and underwear, and "put his first two fingers inside [her vagina]" while "he had the other hand on [her] chest." C.Y. pretended that she was sleeping during the incident, which she stated lasted for twenty minutes; afterwards, Aker washed his hands and, before leaving, he told C.Y. that she "couldn't tell anyone or [she] would get in trouble and he would too." C.Y. then went to the bathroom and, when she wiped herself, she discovered that she was bleeding, which scared her. For several weeks, C.Y. did not tell anyone what had happened because she felt like she had done something wrong.

¶9      C.Y. testified that, eventually, she confided in her mother's best friend, Cari, and told her what Aker had done. Cari testified that C.Y. gave her a "full account" of what

3

happened. Cari's recollection of her conversation with C.Y. was consistent with C.Y.'s testimony, with some differences. Cari testified that C.Y. told her that she and Aker had a short conversation before he "walked over and he kind of grabbed her by the shoulders . . . and laid her down on the couch." Cari also recalled that C.Y. said that she struggled, and Aker told her "this is normal," before unbuttoning her pants. C.Y. also told Cari that the incident lasted half an hour and that she waited until she heard Aker's car leave before she used the bathroom. Aker's attorney did not object as Cari relayed what C.Y. had told her. Cari also testified about the conversation she subsequently had with C.Y.'s mother, Jennifer.

¶10 The State called Jennifer as its next witness. Although C.Y. has never spoken with her mother about what Aker did to her, Jennifer did testify about her phone conversation with Cari after C.Y. informed Cari of what had happened. Jennifer testified that Cari told her that C.Y. "had been sexually molested . . . [by] Jim Aker." Aker's attorney did not object as Jennifer recalled what Cari previously had told her on the telephone.

¶11 After Jennifer testified, the State called Dr. Michelle Corbin, an expert in family medicine. Dr. Corbin testified that Powell County Sheriff Scott Howard referred C.Y. to her and that she performed a sexual abuse examination of C.Y. nearly two months after the assault. Dr. Corbin explained that C.Y. had described the incident to her—that it was a one-time event that lasted for twenty minutes and that Aker had penetrated her vagina with two fingers. Dr. Corbin also explained that, even though she did not find any

4

physical evidence of the assault, that did not surprise her and it did not call into question the veracity of C.Y.'s account because such an injury usually heals within twenty-four to forty-eight hours. Aker's attorney did not object during Dr. Corbin's testimony.

¶12 Next, the State called Kristi Rydeen, a licensed clinical professional counselor, to testify. In addition to testifying about C.Y.'s general demeanor during counseling sessions, Rydeen testified that C.Y. told her about "the incident of abuse perpetuated by Jimmie Aker." On redirect, the prosecutor asked Rydeen, "[i]n your discussions with [C.Y.] did she reference or did you find any other trauma that would explain the symptoms you were observing and having been reported, other than sexual abuse by [Aker]?" Rydeen responded "no." Aker's attorney did not object to those statements identifying Aker as the assailant.

¶13 The defense theory was that Aker could not have committed the crime because he "didn't go to that house" on the night C.Y. was there and because, due to a recent back injury, he physically was incapable of being in the position C.Y. claimed he took during the assault. Though he did not object to their direct testimony, Aker's counsel cross-examined the State's witnesses about certain details in C.Y.'s statements to them to illuminate inconsistencies. For example, he established that C.Y. had related different dates when the offense occurred, whether Aker was standing, kneeling, or on the couch when he assaulted her, where his hands were on her upper body, and whether any of the adults had come home while she was still awake. He also brought out through the State's witnesses other issues and circumstances in C.Y.'s life as alternative explanations for her

5

anxiety and nightmares, including, in part, bullying at school and by her brother and having a father in jail and a mother in military combat duty overseas.

¶14    In his case in chief, Aker called Sheriff Howard to testify about prior inconsistent statements C.Y. made to Howard regarding the date on which the incident occurred and what Aker had told her that night.  Under questioning by Aker's counsel, Howard acknowledged that C.Y. had mistakenly or erroneously alleged that Aker saw her and waved to her during a community gathering months after the assault; an investigation determined that it could not have been Aker.  On cross-examination by the State, Howard testified about additional statements C.Y. made during the interview that were consistent with C.Y.'s trial testimony.  Aker's attorney did not object to that testimony.

¶15    Aker also presented evidence that C.Y. only stayed the night at her cousin's house on one occasion in November and December of 2009.  Aker called three adult witnesses who shared the home—L.L.'s mother, Amie, L.L.'s step-father, Donald, and Donald's sister, Angela.  All three testified that they were friends with Aker, that C.Y. stayed overnight at the house only one time during the period charged, and that Aker did not visit the house on that night.  Aker also called nine-year-old L.L., who testified that C.Y. had only spent the night at her house once, that Aker was not there that night, and that she never told C.Y. that Aker had touched her.  That statement contradicted the testimony of Mary Pat Hansen, a nurse practitioner who had conducted a forensic interview of C.Y. and testified in the State's case in chief.  Hansen acknowledged on cross-examination that C.Y. reported to her that L.L. told C.Y. that Aker also had "touched her" in her "private

6

spots." Aker also introduced testimony, including his own, that he could not have sexually assaulted C.Y. in the manner that she described because he was recovering from a severe back injury in November and December of 2009. The State attempted to discredit Aker's witnesses, pointing out that they all were very close friends and that Aker spent considerable time at their home during the time period in question, when both he and Amie were off work recovering from injuries. The State impeached Amie with evidence that she had lied about whether she sustained her injury from an assault at work or a slip and fall.

¶16 In closing arguments, the prosecutor argued that C.Y. was a credible witness because the core details of the statements she provided to Cari, Sheriff Howard, Dr. Corbin and Rydeen were consistent:

> And what you heard when she testified is that the core, core details about Mr. Aker coming into that home when the kids were sleeping, walking across that room, coming up to her while Hannah Montana was on, sexually assaulting her, pushing her down, placing his fingers in her. Those core details have never changed. Hannah Montana was always on tv every time she told the story.

.  .  .

> Those core details, the details that we would expect a child to remember, the blood, the spotting, the blood, those details have never ever changed. How in the world would [C.Y.] discuss blood in these interviews, the spotting afterwards, wiping herself when Mr. Aker left the house; unless this actually happened.

¶17 After recounting the evidence and discussing C.Y.'s testimony and her demeanor in the courtroom, the prosecutor argued that C.Y.'s testimony was truthful:

7

I'd ask you to consider this, Ladies and Gentlemen, that this case is not overly complicated, it's rather simple. I ask you to consider this; that when [C.Y.] came into the courtroom and told you her story, that she did so for the simple reason that she was telling you the truth; no motive, no other reason.

¶18 The prosecutor contrasted C.Y.'s allegedly truthful testimony with the testimony of the defense witnesses. He argued that, in spite of a bad back, Aker was capable of doing many things and could have committed the act alleged, and that Aker's friends had "[come] into this courtroom and lied" when they stated that Aker did not visit the house the one night C.Y. was there:

> [Y]ou need to look at these people that testified. Certainly they had a strong, strong motive to lie. And it's really, it's kind of, if you knew what was going on in the case, it's pretty unsophisticated really. I mean it's an unsophisticated lie. 'We all just say that we were there that night, and we never left, we never left that night. We'll just say that.' And that Jim Aker never came over. Pretty unsophisticated. 'That's what we're going to remember.' 'Let's just all remember that, that we never left that night'. Pretty unsophisticated. It's not really hard to remember that part of it. And I'm not saying they're unsophisticated, I'm saying the lie is unsophisticated. 'That we just say we were there that night.' Like very, very powerful if you believe it. That unsophisticated lie has the power to rob [C.Y.] of justice for the rest of her life. So we think about this case. Look at their testimony.

¶19 The prosecutor elaborated on the credibility of the defense witnesses:

> So it's very important that you assess . . . the credibility of those three people. And keep in mind that idea, [because] we're all in from different parts of society, from different social stratus [*sic*]. Think about those people. I don't want to disparage them anymore, but these are people who couldn't be asked to take the gum out of their mouth when they were testifying, to change into jeans in the courtroom, to wear something other than sweats and sandals. In that group of people where you're unemployed and collecting unemployment or workers' comp, and you play video games all day, that, there is a nobility for them in the idea that you protect your innocent friend. You rally around him. The problem with that, Ladies and

Gentlemen, is that by doing so they are attempting to rob that little girl of the justice that she requires, the justice that we all require. And that's why we can't let it go, and that's why we have to tell you that they're not being truthful.

.   .   .

So it's not about them just protecting their friend too. Let's also consider their own self-interest. Consider this, how much would they want to admit, and again I have to draw you back to their social strata. How much would they want to admit that on that Friday night when they were staying up until 2:00 o'clock in the morning. We didn't ask them what they were doing, we didn't ask them if they were drinking or if they were doing drugs, I think we knew that they would say 'no'. But how much would they want to admit that they left on that Friday night, their two, 2 year old kids alone, even asleep, and little 8 year old [L.L.], and left her in the care of a 12 year old girl? That's their own self-interest. Do you think they're cognizant of maybe Child Protective Services hearing about that? So it's not just them protecting their friend. They've got their own reasons to protect themselves.

¶20 Aker's counsel did not object to any of these statements. Before concluding, the prosecutor reminded the jury that his argument "isn't evidence. If I said anything here, if you think in any way that I misstated the evidence, disregard it. It's your job to. I don't get to testify." The jury returned a guilty verdict. Aker appeals.

**STANDARD OF REVIEW**

¶21 We generally "do not address issues of prosecutorial misconduct pertaining to a prosecutor's statements not objected to at trial." *State v. Longfellow*, 2008 MT 343, ¶ 24, 346 Mont. 286, 194 P.3d 694. We may review such an issue, however, under the plain error doctrine. *State v. Lacey*, 2012 MT 52, ¶ 14, 364 Mont. 291, 272 P.3d 1288. We apply plain error review only "in situations that implicate a defendant's fundamental constitutional rights when failing to review the alleged error may result in a manifest

9

miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *State v. McDonald*, 2013 MT 97, ¶ 8, 369 Mont. 483, ___ P.3d ___ (citing *State v. Hayden*, 2008 MT 274, ¶ 17, 345 Mont. 252, 190 P.3d 1091). The decision to invoke plain error review is "a discretionary one." *Hayden*, ¶ 17.

¶22 "Only record-based ineffective assistance of counsel claims are considered on direct appeal." *State v. Howard*, 2011 MT 246, ¶ 18, 362 Mont. 196, 265 P.3d 606. To the extent such claims are reviewable, "they present mixed questions of law and fact that we review de novo." *Howard*, ¶ 18.

**DISCUSSION**

¶23 1. *Whether plain error review should be exercised to grant Aker a new trial on his claim of prosecutorial misconduct during closing arguments.*

¶24 Both the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution guarantee criminal defendants "the right to a fair trial by a jury." *Hayden*, ¶ 27. A prosecutor's misconduct "may be grounds for reversing a conviction and granting a new trial if the conduct deprives the defendant of a fair and impartial trial." *McDonald*, ¶ 10 (quoting *Hayden*, ¶ 27). We "consider alleged improper statements during closing argument in the context of the entire argument." *State v. Makarchuk*, 2009 MT 82, ¶ 24, 349 Mont. 507, 204 P.3d 1213. We do not presume prejudice from the alleged prosecutorial misconduct; rather, the "defendant must show

that the argument violated his substantial rights." *McDonald*, ¶ 10 (quoting *Makarchuk*, ¶ 24).

¶25 Aker contends that "the State improperly commented on witness credibility" during closing arguments in contravention of his right to a fair trial by characterizing C.Y.'s testimony as truthful and by portraying the defense witnesses as liars and unproductive members of society. Although he recognizes that his attorney did not object to any of the comments he claims were improper, Aker argues that plain error review is warranted under *State v. Hayden*. The State counters that declining to review the alleged misconduct would not result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of the trial, or compromise the integrity of the judicial process. Instead, the State argues that the prosecutor "appropriately explained to the jury that it would have to resolve issues of credibility" and further explained "what factors it could consider in doing so."

¶26 An attorney "invades the jury's province and engages in highly improper behavior when [he] characterizes the defendant or witnesses as liars or offers personal opinions on a witness's credibility." *State v. Racz*, 2007 MT 244, ¶ 36, 339 Mont. 218, 168 P.3d 685 (citing *State v. Hanson*, 283 Mont. 316, 326, 940 P.2d 1166, 1172 (1997)); *see also* Mont. R. Prof. Cond. 3.4(e) (lawyer shall not state personal opinion as to the credibility of a witness). On the other hand, "it is proper 'to comment on conflicts and contradictions in testimony, as well as to comment on the evidence presented and suggest to the jury inferences which may be drawn therefrom.'" *State v. Daniels*, 2003 MT 247,

11

¶ 26, 317 Mont. 331, 77 P.3d 224 (quoting *State v. Gladue*, 1999 MT 1, ¶¶ 14-15, 293 Mont. 1, 972 P.2d 827). Moreover, to properly preserve the issue for appeal, "the defendant must make a timely objection or it is considered waived." *Racz*, ¶ 36 (citing § 46-20-104(2), MCA); *see also State v. Rose*, 2009 MT 4, ¶ 106, 348 Mont. 291, 202 P.3d 749.

¶27 As we recently discussed in *McDonald*, although a prosecutor must avoid offering personal opinion, comment is appropriate "on 'the gravity of the crime charged, the volume of evidence, credibility of witnesses, inferences to be drawn from various phases of evidence, and legal principles involved'" in the instructions to the jury. *McDonald*, ¶ 14 (quoting *State v. Green*, 2009 MT 114, ¶ 33, 350 Mont. 141, 205 P.3d 798). A prosecutor's argument is not plain error if made in the context of discussing the evidence presented and how it should be used to evaluate a witness's testimony under the principles set forth in the jury instructions. *McDonald*, ¶ 15.

¶28 Aker's reliance on *Hayden* is unpersuasive. While we faulted the prosecutor in that case for voicing his "opinions during closing arguments regarding the credibility of witnesses," *Hayden*, ¶ 29, our decision was based on "multiple errors committed by the prosecutor." *McDonald*, ¶ 12. Most notably, the prosecutor had elicited what amounted to expert opinion testimony from its law enforcement witness that the victim and another key fact witness were telling the truth. In closing argument, the prosecutor then told the jury it could "rely on" the officer and that both the officer and the victim were "believable." *Hayden*, ¶ 32. Additionally, the prosecutor improperly testified "by

12

vouching for the efficacy of the search of [the defendant's] residence" and by "stating his opinion that a scale found in the residence was used for drugs." *Hayden*, ¶ 32. We invoked plain error review because the cumulative effects of these instances of prosecutorial misconduct "[left] unsettled the question of the fundamental fairness of the proceedings." *Hayden*, ¶¶ 29-33; *see also McDonald*, ¶¶ 12-13.

¶29 As the State points out, there are numerous instances in which we have refused to conduct plain error review of a prosecutor's comments regarding witness credibility in closing arguments, even in cases where we have concluded that the comments were improper. We declined review, for example, when a prosecutor categorized a defense witness "as a 'liar,' while arguing the State's evidence was genuine and truthful[.]" *State v. Lindberg*, 2008 MT 389, ¶ 33, 347 Mont. 76, 196 P.3d 1252. In *Lindberg*, we unanimously determined that "the prosecutor's comments [did] not rise to a level sufficient to invoke the plain error doctrine[,]" even though we disapproved of the prosecutor's comments. *Lindberg*, ¶¶ 34-35.[1]

¶30 Our decision in *Lindberg* was not unusual—we generally have refused to invoke plain error review of allegedly improper closing arguments regarding witness credibility. *Rose*, ¶¶ 105-07 (prosecutor argued in closing that defendant had "[gotten] up and [told] the big lie"); *Lacey*, ¶¶ 18-26 (prosecutor argued that the State's witness was "candid," whereas the defendant was not candid and was, "by God," guilty); *McDonald*, ¶¶ 5-17 (prosecutor argued that State's witnesses were "completely believable" and "telling [the

---

[1] *Lindberg* was decided on November 18, 2008, three months after *Hayden*.

13

jury] the truth"; prosecutor's comments were tied to what he believed the evidence showed); *State v. Thorp*, 2010 MT 92, ¶¶ 18, 26-28, 356 Mont. 150, 231 P.3d 1096 (in a sexual intercourse without consent case, prosecutor told jury that the victim was "a very credible witness" who had "no reason to lie"; prosecutor also said she thought the jury should believe the victim); *Racz*, ¶¶ 35-36 (in closing arguments, prosecutor stated the State's witness had "no reason to lie," was "honest" and "told the truth"); *State v. Arlington*, 265 Mont. 127, 157-61, 875 P.2d 307, 325-28 (1994) (prosecutor stated "a number of times [that the defendant] had lied to the jury"); *State v. Rogers*, 257 Mont. 413, 417-20, 849 P.2d 1028, 1031-33 (1993) (prosecutor "called the defendant and his son liars during closing argument"). *Hayden* appears to be the only time we have granted a party's request to invoke plain error review on the ground that a prosecutor made improper comments regarding witness credibility to which the defendant failed to object. *See Longfellow*, ¶ 24. Aker points to no other case where we invoked plain error review on these grounds.

¶31 Since there were no witnesses to the claimed encounter, the entire trial of this case was about who was telling the truth. As the prosecutor argued, the jury either could believe twelve-year-old C.Y. or could believe Aker and his three friends. Though the prosecutor used the word "lie," defense counsel had used that same word in questioning Aker's witnesses whether they had "cook[ed] up a story" to protect their friend and whether they would "lie for Jimmie [Aker] even though he's [like] family." The prosecutor tied his remarks to evidence presented at trial and to the court's instruction

14

that, in determining witness credibility, the jury was to consider "every matter in evidence that tends to indicate whether a witness is worthy of belief." Each party's closing argument focused on why the jury should believe that party's witnesses and not those of the other side. Without parsing each of the prosecutor's comments, in the final analysis—having reviewed the trial transcript and considered the comments in the context of the entire argument and in light of the specific evidence presented by both sides—we are not convinced that failure to review Aker's claims will result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of his trial, or compromise the integrity of the judicial process. By failing contemporaneously to object to the prosecutor's comments concerning witness credibility, Aker waived his right to do so on appeal. *Rose*, ¶ 106.

¶32 2. *Whether Aker received ineffective assistance of counsel due to his counsel's failure to object to hearsay testimony that bolstered the victim's credibility.*

¶33 Aker contends that his lead trial attorney, William Hooks, provided ineffective assistance of counsel when he failed to object at numerous points during the trial, including: (1) when Cari, Jennifer, and Sheriff Howard testified about statements C.Y. made describing the alleged abuse; (2) when Dr. Corbin testified about statements that C.Y. made to her describing the abuse; (3) when Dr. Corbin testified that the lack of any physical findings two months after the assault did not "have any reflection on the veracity of [C.Y.'s] report" because C.Y.'s injuries would have healed within a few days; and (4) when Rydeen testified that C.Y. had identified Aker as the perpetrator during

15

counseling sessions. Aker contends that "a failure to raise an objection, generally, has been deemed record based, and therefore appropriate for direct appeal." The State counters that "there is a plausible explanation for defense counsel's decision not to object." The State argues that Hooks's lack of objection reflected a broader trial strategy designed to allow Aker to expose "inconsistencies in C.Y.'s prior statements in order to highlight those inconsistencies to the jury during cross examination of the State's adult witnesses" without directly cross-examining the young victim about discrepancies in her story.

¶34 The right to effective assistance of counsel is guaranteed by both the United States and Montana Constitutions. *State v. Kougl*, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095. Before reaching the merits of an ineffective assistance of counsel claim in a direct appeal, we "must first determine whether the allegations are properly before the Court on appeal or whether the claim should be raised in a petition for post-conviction relief" pursuant to § 46-21-101, MCA. *State v. Upshaw*, 2006 MT 341, ¶ 33, 335 Mont. 162, 153 P.3d 579. To make this determination, we ask "'why' counsel did or did not perform as alleged and then seek to answer the question by reference to the record." *Howard*, ¶ 21 (quoting *Kougl*, ¶ 14). If the claim is based on matters outside of the record, "we will refuse to address the issue on appeal." *Kougl*, ¶ 14. Only through a petition for postconviction relief may the record be developed to explain "why" counsel acted as alleged, which then allows a reviewing court to determine "whether counsel's performance was ineffective or merely a tactical decision." *Kougl*, ¶ 14.

16

¶35 We have regarded an alleged failure to object to witness testimony as "record-based, and therefore appropriate for direct appeal." *State v. White*, 2001 MT 149, ¶ 15, 306 Mont. 58, 30 P.3d 340. We also have recognized, however, that "decisions regarding the timing and number of objections lie within counsel's tactical discretion, which would indicate that non-record based information explaining the tactic may be involved, and thus should be barred from review on direct appeal." *White*, ¶ 16 (citing *State v. Brown*, 228 Mont. 209, 212, 741 P.2d 428, 430 (1987)). If the record does not "fully explain" why the attorney failed to object, the matter "is best suited for post-conviction proceedings." *Upshaw*, ¶ 33; *see also State v. Dyfort*, 2000 MT 338, ¶¶ 9-12, 303 Mont. 153, 15 P.3d 464 (holding that, because the record was silent as to the attorney's trial strategy regarding his failure to object, the defendant's objections were not record based).

¶36 We agree with the State that it is plausible that Aker's attorney made a tactical, strategic decision by not objecting to the testimony that Aker now contests on appeal. Hooks did object, successfully, to numerous questions during the State's cross-examination of Aker's witnesses. "Counsel's use of objections lies within his or her discretion." *Riggs v. State*, 2011 MT 239, ¶¶ 53-54, 362 Mont. 140, 264 P.3d 693 (rejecting ineffective assistance of counsel claim based on failure to object to child victim's prior consistent statements in light of counsel's postconviction testimony that he wanted to point out inconsistencies in the witnesses' testimony).

17

¶37 Hooks argued in closing that it was not unreasonable for the defense witnesses, all of whom shared the home where the assault allegedly occurred, to talk to each other about the fact that someone they considered family was accused of a crime "they know he could not have committed," and that this did not mean the three had conjured a lie to protect their friend. His closing argument focused on all the mistakes C.Y. made in the stories she told others and on the inconsistencies in her various statements about the event. Hooks told the jury it could not ignore those inconsistencies in judging the credibility of her accusations. Without directly attacking the victim, he suggested the evidence showed other anxiety-producing factors in her life that could explain her accusations. While it was impossible to know the cause, Hooks argued, that wasn't Aker's burden to demonstrate, and the State had not proven guilt beyond a reasonable doubt. Because the trial record does not include Hooks's explanation of his trial strategy concerning C.Y.'s prior consistent statements, this Court "will not speculate" on the claimed error. *See Dyfort*, ¶ 11. Consequently, we conclude that Aker's allegations of ineffective assistance of counsel are not record based and we dismiss this portion of the appeal without prejudice. *Dyfort*, ¶ 12.

¶38 For the foregoing reasons, the judgment is affirmed.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT

18

/S/ JIM RICE
/S/ BRIAN MORRIS

Justice Laurie McKinnon, dissenting.

¶39 I respectfully dissent from the Court's decision on both issues.

¶40 As to Issue 1, I believe prosecutor Thompson's remarks about three of the defense witnesses (Amie Manahan, Angela Zinke, and Donald Zinke Jr.), and his assertions about the truthfulness of these witnesses' testimony, constitute plain error requiring a new trial.

¶41 In his rebuttal closing argument, prosecutor Thompson chose not only to "disparage" (Thompson's own word) Amie, Angela, and Donald, but also to tell the jury that he had personally determined that these witnesses were liars. Thompson asserted (more than once) that Amie, Angela, and Donald were from a "different social stratu[m]."[1] He told the jury that these individuals belong to "that group of people where you're unemployed and collecting unemployment or workers' comp, and you play video games all day." He criticized Amie's, Angela's, and Donald's attire in court and the fact that one or more of them had been chewing gum while on the witness stand. He posited that these witnesses had "rall[ied]" around Aker because there is recognized "nobility" among these sorts of people to protect their friends, even if doing so "rob[s]" a crime victim of justice. Thompson concluded his remarks by telling the jurors: "And that's

---

[1] Thompson used the word "stratus." However, I presume he meant "stratum," given that "stratus" refers to a type of cloud formation. In this context, "stratum" means "a socioeconomic level of society comprising persons of the same or similar status esp. with regard to education or culture." *Merriam-Webster's Collegiate Dictionary* 1162 (10th ed., Merriam-Webster 1997).

why we [referring to the prosecution] can't let it go, and that's why we have to tell you that they [referring to Amie, Angela, and Donald] are not being truthful."

¶42    Thompson's disparagements of the defense witnesses and his assertions of personal knowledge about the truthfulness of their testimony were highly improper and unacceptable. Determinations of the credibility and weight of testimony are exclusively within the province of the jury, not the prosecutor. *State v. Hayden*, 2008 MT 274, ¶ 26, 345 Mont. 252, 190 P.3d 1091. A prosecutor "should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence." *ABA Stands. for Crim. Just.: Prosecution Function and Def. Function*, Stand. 3-5.8(b), 106 (3d ed., Am. B. Assn. 1993); *accord Hayden*, ¶ 28. Thompson's remarks violated this professional standard, intruded on the jury's function, and prejudiced the constitutional right of the defendant to receive a fair and impartial trial.

¶43    Characterizing Amie, Angela, and Donald as lazy, ill-bred, and poorly clothed, telling jurors that these three individuals come from a "different social stratu[m]," and implying personal knowledge that these witnesses "are not being truthful" clearly exceeded the bounds of proper argument. This is precisely the sort of prosecutorial misconduct that we recently condemned in *State v. Criswell*, 2013 MT 177, ¶ 49, 370 Mont. 511, ___ P.3d ___. As Chief Justice McGrath observed in his concurring opinion, "[a] prosecutor is an officer of the court" who "must strive to promote justice and the rule of law." *Criswell*, ¶ 57 (McGrath, C.J., concurring). " 'Unfortunately, some prosecutors have permitted an excess of zeal for conviction or a fancy for exaggerated rhetoric to

20

carry them beyond the permissible limits of argument.' " *Criswell*, ¶ 55 (McGrath, C.J., concurring) (quoting *ABA Stands. for Crim. Just.: Prosecution Function and Def. Function*, Stand. 3-5.8, Commentary, 107). In this regard, "[p]rosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office." *ABA Stands. for Crim. Just.: Prosecution Function and Def. Function*, Stand. 3-5.8, Commentary, 107. "Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued." *ABA Stands. for Crim. Just.: Prosecution Function and Def. Function*, Stand. 3-5.8, Commentary, 108. Such personal opinions have no place in a prosecutor's closing argument.

¶44    We have explained that the applicability of plain error review must be decided on a "case-by-case" basis. *State v. Sullivant*, 2013 MT 200, ¶ 17, 371 Mont. 91, ___ P.3d ___; *State v. Daniels*, 2003 MT 247, ¶ 20, 317 Mont. 331, 77 P.3d 224; *State v. Finley*, 276 Mont. 126, 138, 915 P.2d 208, 215 (1996), *overruled on other grounds*, *State v. Gallagher*, 2001 MT 39, ¶ 21, 304 Mont. 215, 19 P.3d 817. Here, however, the Court presents a string-cite of cases in which we have not exercised plain error review of a prosecutor's comments. Opinion, ¶¶ 29-30. Far from a "case-by-case" approach, the Court asserts as a "general" rule that we do not review improper remarks by a prosecutor

under the plain error doctrine—even going so far as to fault Aker for not pointing to any case other than *Hayden*. Opinion, ¶ 30. In my view, however, the Court's precedent shows something else: that nine times out ten, this Court is willing to overlook improper remarks by prosecutors. The message that this increasingly prevalent practice is sending, unfortunately, is that prosecutors in this State can be assured of having their convictions upheld despite comments made during trial which violate ethical rules and "run the risk of undermining the fundamental fairness of the judicial process." *State v. Lindberg*, 2008 MT 389, ¶ 34, 347 Mont. 76, 196 P.3d 1252. Until there are actual consequences, such as reversal of the conviction, the problem is going to persist.

¶45 We must evaluate whether plain error is appropriate in light of the facts of the case before us. Thompson's remarks during closing argument plainly exceeded the bounds of proper argument. In so doing, his conduct compromised the integrity of the judicial process and calls into question the fundamental fairness of Aker's trial. Under such circumstances, it is this Court's "paramount obligation" to review Aker's prosecutorial misconduct claim and grant appropriate relief. *Finley*, 276 Mont. at 137, 915 P.2d at 215. In my view, the Court misapplies our plain error doctrine in reaching a contrary result.

¶46 Turning now to Issue 2, I conclude that defense counsel rendered constitutionally deficient representation by failing to object to the prosecution's presentation (through multiple witnesses) of C.Y.'s hearsay statements about the offense. Given that the State's case against Aker depended entirely on C.Y.'s credibility, I would hold that counsel's deficient performance prejudiced the defense, thus requiring that Aker be granted a new

22

trial. While the Court theorizes that defense counsel made a "tactical, strategic decision" not to object to C.Y.'s hearsay statements, and then speculates further about what defense counsel's supposed reasons might have been, Opinion, ¶¶ 36-37, it is my view that, regardless of why defense counsel remained silent, his doing so was objectively unreasonable, *Whitlow v. State*, 2008 MT 140, ¶¶ 18, 20, 343 Mont. 90, 183 P.3d 861.

¶47 "When claims of ineffective assistance are capable of resolution by examining the record alone, they are appropriate for consideration on direct appeal." *State v. Howard*, 2011 MT 246, ¶ 21, 362 Mont. 196, 265 P.3d 606. Generally, we ask "why" counsel did or did not perform as alleged, and then seek to answer the question by reference to the record. *State v. Kougl*, 2004 MT 243, ¶ 14, 323 Mont. 6, 97 P.3d 1095.

> If the record on appeal explains "why," we will then address the issue on appeal. If, as is usually the case, the claim is based on matters outside the record on appeal, we will refuse to address the issue on appeal and allow the defendant to file a postconviction proceeding where he/she can develop a record as to "why" counsel acted as alleged, thus allowing the court to determine whether counsel's performance was ineffective or merely a tactical decision.

*Kougl*, ¶ 14.

¶48 We have observed that it may not be necessary to ask "why" in the first instance, however. *Kougl*, ¶ 15. One such exception, although infrequently applied, is where there is "no plausible justification" for what defense counsel did. If it is apparent that there is no plausible justification for defense counsel's conduct, then "[w]hether the reasons for defense counsel's actions are found in the record or not is irrelevant. *What matters is that there could not be any legitimate reason for what counsel did.*" *Kougl*, ¶ 15 (emphasis

23

added). We applied this exception in *Kougl* and determined that there was no reason for trial counsel not to ask for a jury instruction to view the testimony of the defendant's accomplices with suspicion. *Kougl*, ¶ 20. We noted that trial counsel had nothing to lose in asking for the instruction. *Kougl*, ¶ 21.

¶49 We also applied the exception in *State v. Jefferson*, 2003 MT 90, 315 Mont. 146, 69 P.3d 641, and found that there was "no plausible justification" for defense counsel's remarks in opening and closing statements which undermined the ability of his client to obtain an acquittal. *Jefferson*, ¶ 50. Similarly, in *State v. Rose*, 1998 MT 342, 292 Mont. 350, 972 P.2d 321, we found that there was no plausible justification for defense counsel's failure to ask that the jury be instructed to view an accomplice's testimony with suspicion. Counsel had nothing to lose in asking for the instruction, and if counsel had asked for the instruction the trial court would have been obligated to grant the request. *Rose*, ¶ 18.

¶50 Allegations of child sexual abuse are very difficult cases to prosecute. Where the victim is young and unable to testify about a secretive encounter, there often is no other evidence for a prosecutor to rely on in proving the State's case. Following many child sexual abuse investigations, a prosecutor unfortunately may be forced not to proceed because he is ethically bound to pursue only those prosecutions which he can, by applicable law and rules of evidence, prove. Many states, Montana included, have addressed these difficulties by allowing expert witnesses to testify directly about the credibility of a victim who testifies in a child sexual abuse trial, *see State v. Scheffelman*,

24

250 Mont. 334, 342, 820 P.2d 1293, 1298 (1991), and have enacted statutes to assist in the prosecution of child sexual abuse, *see* § 46-16-220, MCA (child hearsay exception in criminal proceedings).

¶51    The instant proceedings involved an allegation of sexual intercourse without consent perpetrated upon a 12-year-old victim.  There were no eyewitnesses to the offense, and while she clearly was competent to testify, C.Y.'s credibility—like that of any child witness—was subject to attack.  This was apparent from the beginning of trial: in voir dire, the prosecution suggested that "what the girl has to say when she comes into court and testifies is the most important piece of evidence in these types of cases," and in his opening statement, defense counsel told the jury that, "[f]or whatever reason, [C.Y.] was mistaken."

¶52    C.Y testified first and provided sufficient details to satisfy the elements of the offense.  Aside from circumstantial evidence regarding C.Y.'s demeanor following the offense, described by persons who were not witnesses to the crime, the prosecution had very little more that it could present.  The State offered no expert witnesses pursuant to the requirements of *Scheffelman*, 250 Mont. at 342, 820 P.2d at 1298, and the State's case, therefore, necessarily would rise or fall on the credibility of C.Y.

¶53    In the context of a child sexual abuse prosecution, there can be "no plausible justification" for the admission of hearsay, without objection, that corroborates the child victim's story.  Nevertheless, defense counsel did not object to the admission of C.Y.'s hearsay statements through five different witnesses—two laypersons, a physician, a

25

counselor, and a law enforcement officer—which bolstered C.Y.'s testimony and corroborated the details of the assault.

¶54   Cari, a "second mom" to C.Y., was asked by the prosecution to give "a full account" of what C.Y. had told her.  Cari testified:

> Q.   What did she tell you?
> A.   She was telling me that she was sitting on the couch watching t.v., and the kids were upstairs sleeping, and Jim walked in the house and he asked where everybody was at.  And she said "well, the kids are upstairs sleeping" and Amie and Don were gone, she was babysitting.  And so he didn't say anything but he walked over and he kind of grabbed her by the shoulders, just, not forcefully but just kind of gently and laid her down on the couch.  And when she I guess tried to struggle up once, he just said "It's okay.  This is normal."  And so she just laid there and he started unbuttoning her pants and pulling her down.
>
> .   .   .
>
> Q.   What is her demeanor when she is telling you about this?
> A.   She's crying. Her whole body is still shaking.  Almost like she's just cold, she just, her whole body is just absolutely shaking.  But I gave her her time, you know, I didn't rush her.  I told her, I said "you know, you just need to tell me what happened and make sure that you're telling me the truth."  And so she started proceeding to tell me about how he took his hand and separated her legs and he was kind of holding her down with one hand and pulling her legs apart with the other.  And he took his fingers, and I stopped her there and I asked her; "I know this sounds funny, but how many fingers", and she said "two" that she could think of.  She said he had very big hands.  And he proceeded to rub her vagina and started going up inside of her and was, she was; he was going in and out of her with his fingers.

¶55   Cari provided significantly more detail of the incident than C.Y. had given during her testimony.  The evidence was clearly hearsay.  Yet, Aker's attorney did not object to these statements corroborating and supplementing C.Y.'s own testimony.

26

¶56 The prosecution next called Jennifer, C.Y.'s mother. Jennifer stated that Cari had told her C.Y. was sexually molested by Jim Aker. Specifically, Jennifer testified: "She told (inaudible – crying) Cari told me that my daughter had confided in her that she had been sexually molested." When Jennifer asked who had molested C.Y., "[Cari] said that it was Jim Aker." This evidence was clearly hearsay. Aker's attorney did not object to these statements which corroborated and verified the occurrence of the assault and identified Jim Aker as the assailant.

¶57 The State called Dr. Michelle Corbin, who testified that she had conducted a sexual abuse examination of C.Y. Dr. Corbin stated that C.Y. "told me there was digital penetration," "told me it lasted approximately 20 minutes," "told me that she thought it happened at the end of November," and "reported that there was some bleeding afterwards." Dr. Corbin opined that the lack of physical findings, as in C.Y.'s case, did not reflect on the veracity or truth of C.Y's report. No objection was made to any of this testimony.

¶58 The State called Kristi Rydeen, a licensed clinical professional counselor, who testified that C.Y. had told her about "the incident of abuse perpetrated by Jimmie Aker." The prosecution asked Rydeen, "In your discussions with [C.Y.] did she reference or did you find any other trauma that would explain the symptoms you were observing and having been reported, other than the sexual abuse by [Aker]?" Rydeen replied, "No." Defense counsel did not object to these statements identifying Aker as the assailant.

27

¶59     The defense called Sheriff Scott Howard, who had been the lead investigator in the case.  Defense counsel covered four areas of examination:  C.Y.'s statements as to the date of the offense; C.Y.'s statements as to how she was initially accosted; the Territorial Days Celebration, held seven months after the offense, where C.Y. mistakenly thought she saw Aker; and Aker's *Miranda* rights.  In cross-examination, however, the prosecutor was allowed to describe C.Y.'s hearsay statements that Aker had put his fingers inside her, that it lasted 20 minutes, that Aker used his hand to hold her down, and that C.Y. bled as a result.  Sheriff Howard confirmed the following details of the incident on which C.Y. had been consistent:

> Q.     But [C.Y.] told you some other things during that [interview] as well, didn't she?
> A.     She did.
> Q.     She told you she was watching a show, right?
> A.     She did.
> Q.     And she told you she was sitting on a couch when she was watching her show, right?
> A.     She did.
> Q.     And you indicated to Mr. Hooks that she also said "he told me to lay down," right?
> A.     That's correct.
> Q.     And that "everything was going to be okay"?
> A.     That's correct.
> Q.     And that he put his hand on her chest, correct?
> A.     Correct.
> Q.     And he stuck his fingers inside of her?
> A.     He did.
> Q.     And pulled her pants down, right?
> A.     That's what she said, yes.
> Q.     This is what [C.Y.] is telling you on January 14th, right?
> A.     That's correct.
> Q.     Approximately 5-6 weeks after the alleged incident, right?
> A.     That'd be fair, yes.
> Q.     She said it lasted about 20 minutes?

28

A. She did.
Q. And even at that time she said she had her eyes closed, right?
A. Yes.
Q. And then she told you afterwards she was bleeding?
A. She did.
Q. And she also said at that time that Mr. Aker told her that [she] and he would be in trouble if she told anybody?
A. She did.

Consequently, in addition to C.Y.'s testimony, the jury heard the core details of the incident on five more occasions through five different witnesses. All of these witnesses' testimony about the incident came from C.Y.'s hearsay statements. None of the witnesses had personal knowledge of the facts of the incident. All of this testimony was admitted without objection from Aker's counsel.

¶60 The State argues that Aker's counsel failed to object to C.Y.'s prior consistent statements, presented through five other witnesses, in order to emphasize "inconsistent details" in C.Y.'s retelling of the incident. However, the admission of prior inconsistent statements is not contingent upon the admission of prior consistent statements. Prior inconsistent statements are admissible pursuant to M. R. Evid. 801(d)(1)(A). Prior consistent statements, on the other hand, are not admissible unless they are "offered to rebut an express or implied charge against the declarant of subsequent fabrication, improper influence or motive." M. R. Evid. 801(d)(1)(B). We have held that the prior consistent statement rule applies only when the declarant's in-court testimony has been impeached by another party's allegations of subsequent fabrication, improper influence, or motive. *State v. McOmber*, 2007 MT 340, ¶ 15, 340 Mont. 262, 173 P.3d 690; *see also State v. Champagne*, 2013 MT 190, ¶ 39, 371 Mont. 35, 305 P.3d 61. Here, there

were no allegations of subsequent fabrication or that C.Y. had been improperly coached or influenced. Thus, it is not plausible to allow the admission of prior consistent statements, which corroborated C.Y.'s testimony, for the purpose of emphasizing prior inconsistent statements. Aker's counsel could have had the inconsistent statements admitted under M. R. Evid. 801(d)(1)(A) and objected to C.Y.'s prior consistent statements under M. R. Evid. 801(d)(1)(B).

¶61 The Court's reliance on *Riggs v. State*, 2011 MT 239, 362 Mont. 140, 264 P.3d 693—*see* Opinion, ¶ 36—is unpersuasive. There, the district court found in the postconviction proceeding that "the alleged prior consistent statements were not hearsay, were successfully objected to, or were inconsistent with other statements made by the girls." *Riggs*, ¶ 52. Here, in contrast, C.Y.'s statements—as repeated at trial by Cari, Jennifer, Dr. Corbin, Rydeen, and Sheriff Howard—were plainly hearsay. They were not objected to at all. And they were not inconsistent with C.Y.'s testimony, but were in fact consistent with C.Y.'s description of the "core details" of the incident—something the prosecution hammered during its closing arguments. *Riggs* is simply not on point.

¶62 The notion that Aker's counsel endeavored in his cross-examination of the State's witnesses to "illuminate inconsistencies" in C.Y.'s statements, Opinion, ¶ 13, is speculation. It also misstates counsel's argument. For example, regarding the date of the offense, C.Y. originally told Sheriff Howard that the incident occurred in the third or fourth week of November 2009, but further investigation revealed that the actual date was December 4, 2009. Aker's counsel argued in closing that this was "not an inconsistency.

30

It's a mistake." He added: "We know that [C.Y.] was wrong, verifiably wrong in other regards." Counsel later reemphasized that "we know that the child in question, [C.Y.], had made mistakes." The point of this argument was not that C.Y. gave inconsistent stories to different people; counsel's argument, more precisely, was that C.Y. was a child who tended to make "mistakes." He used this term continually throughout his closing. Clearly, however, it was not necessary for counsel to allow repeated recitations of C.Y.'s prior consistent statements in order to show that C.Y. was a child who makes mistakes.

¶63 Based upon the foregoing, I believe it is not necessary to ask "why" counsel failed to object to the admission of C.Y.'s hearsay statements. In my view, there is no plausible justification for failing to object and we thus may rule on the merits of Aker's ineffective assistance of counsel claim on direct appeal. Further, having determined that Aker's counsel could have no plausible justification for failing to object, counsel's performance was deficient and the first prong of the test is satisfied. *See Riggs*, ¶ 9 (to prevail on an ineffective assistance of counsel claim, the defendant must first demonstrate "that counsel's performance fell below an objective standard of reasonableness").

¶64 To establish prejudice under the second prong of the test, Aker must show "that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different." *Riggs*, ¶ 9. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." *Riggs*, ¶ 12. Here, the cumulative effect of counsel's errors prejudiced Aker's right to a fair trial. *State v. Ferguson*, 2005 MT 343, ¶ 126, 330 Mont. 103, 126 P.3d 463. It is reasonably

31

probable that the outcome of the proceeding would have been different had counsel objected to the introduction of all of C.Y.'s prior consistent statements. Indeed, this is clear from the prosecution's heavy emphasis, during closing argument, on the fact that

> the core, core details about Mr. Aker coming into that home when the kids were sleeping, walking across that room, coming up to her while Hannah Montana was on, sexually assaulting her, pushing her down, placing his fingers in her. Those core details have never changed. Hannah Montana was always on tv every time she told the story [to the various witnesses who then repeated her statements at trial].

Permitting the jury to hear improper hearsay testimony from five different witnesses which corroborated the victim's testimony and the specific details of the sexual assault prejudiced Aker's right to a fair trial.

¶65 For the foregoing reasons, I would reverse Aker's conviction based upon prosecutorial misconduct and ineffective assistance of counsel. I respectfully dissent from the Court's contrary decision.


/S/ LAURIE McKINNON


Justice Patricia O. Cotter joins the Dissent of Justice Laurie McKinnon.


/S/ PATRICIA COTTER